IN RE ESTATE OF HENRY J. STUERTZ.
CASPER STUERTZ ET AL., APPELLANTS, v. PAULINE C. STUERTZ, APPELLEES.

FILED DECEMBER 1, 1932. No. 28308.

150

*Max Kier*, for appellants.

*Chambers & Holland, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

DEAN, J.

This is an appeal from the district court for Lancaster county in a proceeding to determine the right to heirship in the estate of Henry J. Stuertz, who died intestate September 19, 1929. The estate consists of about $1,000 in a savings bank, and a judgment of approximately $10,000 which was obtained in an action for the wrongful death of the decedent. Surviving Stuertz at the time of his death were his wife, Pauline C. Stuertz, and his father and mother, Casper and Elizabeth Stuertz, who are the petitioners herein.

On May 23, 1930, a baby girl was born to the widow of the decedent, and the question for determination is whether the child was alive at birth or whether it was dead when it was born. A motion for a directed verdict was sustained in favor of the respondent Pauline C. Stuertz and, pursuant thereto, the jury, as directed, found that the child was alive at birth and that the widow and the child were the heirs of the estate of Henry J. Stuertz. The petitioners have appealed.

Dr. J. J. Loomis, the attending physician at the birth of the child, testified that "it was an unusually long, hard delivery," requiring almost two hours to deliver the head, and that the usual time was 10 or 15 minutes; and that, because of a projection in the lower part of the spine, obstruction to the passage of the baby's head was offered,

making it necessary to employ forceps to the head of the child for approximately an hour and a half or two hours before the child could be delivered. The record discloses that the baby was "blue" at birth, due to interference of circulation or occasioned by pressure on the cord or to the long delivery. It is also disclosed that there were certain bruises on the head of the child from the forceps. There was no spontaneous breathing by the child at any time, nor did the doctor notice any voluntary movement of the muscles except a pulsating of the cord. The child, however, reacted toward artificial respiration and the heart tones responded to such stimulation and diminished when it was discontinued.

From the evidence of Dr. Loomis it also appears that after the birth of the child the cord was tied and injections of lobelia were administered to stimulate breathing and that artificial respiration and other usual methods were employed to revive the newly-born infant. The doctor also employed mouth insufflation or mouth to mouth breathing for 20 to 30 minutes during which time he could feel the chest of the child expand. The heart beats continued up to within three or four minutes before the mouth insufflation was discontinued. This physician testified that, in his opinion, the heart tones were audible for too long a time to have been due to stimulation of the fœtal heart and he concluded that it was worth while to make an attempt to bring about respiration as long as the heart beats continued.

An examination of the child was made before its delivery to determine the general condition, and the fœtal heart tones were heard by means of a stethoscope and appeared to be normal. The stethoscope was also employed during the delivery and the heart tones were found to be slower just before the delivery was completed. It is disclosed that the child made no sound of its own volition except during the artificial respiration or the mouth insufflation when, according to the doctor's evidence, there were two or three "grunts" when the air was being

pressed out of the child's chest. The doctor also testified that the pulsating of the cord was noticeable for 15 to 20 minutes, which indicated that the blood was circulating. He also expressed the opinion that the circulation and the beating of the child's heart were independent of the impetus given to it by the mother's circulation, and that the fœtal circulation is entirely separate from the mother's circulation before birth.

Dr. Covey, a specialist in internal medicine and diagnosis, testified on the part of the respondent that, in his opinion, the child was born alive. He based his opinion on the full-term pregnancy, the pulsating cord, the heart tones, and also the fact that the heart responded to artificial respiration. Dr. Covey testified that the pulsation in the umbilical cord was due to the beating of the child's heart, and not to stimulation from placental circulation. The hospital record shows that the following notation was made there, namely: "Fœtal heart tones discernible for ten minutes following delivery."

According to the state director of public health, a child that makes no outcry at birth, never breathes, and does not voluntarily move a muscle is properly reported as a stillbirth and, in a case where heart tones are detected by means of a stethoscope after delivery, such a child also is classified as stillborn.

It appears that the child in question was reported on the birth certificate as having been "stillborn," and on the certificate of death the cause of death is reported as toxemia. Dr. Loomis testified that the birth of a dead fœtus, after the 28th week of pregnancy, he considered as "deadborn," while the birth of a child which lives for a half hour was considered as "stillborn," the difference being that the "deadborn" show no vital function, while the "stillborn" display vital functions, but do not live.

On the part of the petitioners, the evidence of a physician was introduced who was of the opinion that the use of the instruments during the delivery caused an injury to the head of the child and that it was not alive at

birth. And certain of the petitioners' relatives testified that they viewed the body of the child and noticed bruises and other disfigurations on its head. The physician, called by the petitioners, also testified that the heart is an automatic organ and that the fœtal heart has been known to beat after the delivery of an infant without respiration and even where there is no independent life. From his own experience he testified that he had applied artificial respiration to a child for an hour and a half or two hours before the child responded and started breathing.

In Herzog, Medical Jurisprudence, sec. 32, it is stated: "A person is dead at the moment heart action, respiration, and the action of the central nervous system permanently cease." The pulsation in the umbilical cord is due to the action of a child's heart and "such pulsation indicates that the heart was contracting, and contractility of the heart muscles is as good a proof of life (if it be not a better) as contractility of the diaphram or of the intercostal muscles." Tidy, Legal Medicine, part II, p. 252. In the last cited work it is also stated that, even if a child had never cried, never breathed, and never moved, the medical jurist would be justified in declaring the child to be living if the heart was heard to beat. In *Brock v. Kellock*, 30 L. J. n. s. 498, where a child was not seen to breathe, but a pulsation in the funis was observed, such pulsation was held to be a sign of life and it was held that proof of breathing was unnecessary. And in *Goff v. Anderson*, 91 Ky. 303, it was likewise held that a child was born alive when it made an effort to breathe after independent circulation and delivery, and by "independent circulation" it was meant a circulation that was maintained by the child's own vitality independent of that of the mother.

In *Doe d. Cannon v. Killen*, 5 Houst. (Del.) 14, where a baby was found to be alive before delivery and thereafter the beating of its heart was felt, and the pulsation of the umbilical cord was strong, and the heart continued

to beat for five minutes after the cord was severed, it was held that circulation was established and that the baby was alive at birth. "A child never heard to cry, and who did not live, but whose heart beats were perceptible and could be heard, though no respiration could be induced, was 'born alive,' and was 'issue,' within a will." *In re Union Trust Co.*, 151 N. Y. Supp. 246. See, also, *Fleming v. Sexton*, 172 N. Car. 250.

To recapitulate: The evidence establishes that the child at no time voluntarily breathed; that it made no sound; and that it made no movement of any muscle of its own volition. And it is also established that the child was well developed and its heart tones were discernible by means of a stethoscope before delivery; that the heart tones were heard 20 or 30 minutes after birth, according to the doctor's evidence, and, according to the hospital record, the heart tones were noticeable 10 minutes following birth. There was a pulsation of the umbilical cord for 15 or 20 minutes after it was severed and, under the authorities and the evidence, such pulsation appears to have been independent of the mother's circulation. We think it clearly appears that the vital functions of the child had not irrevocably ceased and it could not be pronounced dead at birth, and therefore for every legal purpose the child was alive at birth.

In view of the facts disclosed by the record, and the law applicable thereto, we conclude that the court did not err in directing a verdict for the respondent. The judgment is

AFFIRMED.