MINNIE WEHRMAN, Appellant, v. FARMERS & MERCHANTS SAV-INGS BANK OF DURANT, et al., Defendants, Appellees; ADOLPH G. ALTEMEIER et al., Defendants, Appellants; FORREST KUNZE, Administrator, et al., Intervenors, Appellants.

No. 42813.

250

March 5, 1935.

Supplemental Opinion on Petition for Rehearing and Rehearing Denied April 7, 1936.

Campbell & Campbell, V. H. Morgan, M. R. Hammer, Jr., and H. C. Schulz, for appellants.

Royal & Royal, Marion C. Hamiel, and V. H. Morgan, for appellees.

Cross & Hamill, and Thomas J. Bray, for intervenor Forrest Kunze.

RICHARDS, J.—This was an action in equity to partition the real estate of which R. P. Rasmussen died seized. This decedent, a resident of Jasper county, died testate on May 28, 1933, and his will, admitted to probate, is in the following words:

"Newton, Iowa, June 9, 1928.
"This is my will that Irene W. Rasmussen my only dather and her mather Scharlotte Heleiner Rasmussen died the year of .1906 and her sister my dather Isabel E. Rasmussen died the

year 1925 leaving Irene W. to be my only Ears. I never merred since Scharlotte died and if anyone claim to be my lawful wife at my dead they shal receive one dollar and they must paid all Cort Cost themselves. Everything which is in my name goes to Irene W. Rasmussen and she has they rigth to pay all dedpt and collect all monney commen to me take full charge of everything without any bonds whatever I want to give her all the privilege I got myselv tol all my personal and real estate property. She is not soposed to give any detail nor accound of anything to enybody onles soe required by law. Irene must deposit $50.00 to proper autority for opkeep of cemetery lot. This is my last Will and I think I have as clear mind today as I ever had and have not been persuated to whrite this by enyone. Irene W. Rasmussen now married Kunze.

"R. P. Rasmussen.

"John W. Clouse
"R. C. Daly, Witnesses.

"Subscribed and sworn to before me in my presence this 16th day of June, 1928.

"J. H. Warburton, Notary."

At the time of the making of the will, the wife of testator and daughter Isabel were deceased, and the only issue of testator was his daughter Irene Kunze, also referred to in the will as Irene W. and Irene W. Rasmussen, now married to Kunze. Rasmussen remained a widower until his decease. The daughter, Irene Kunze, became the wife of intervenor Forrest Kunze, on June 14, 1928, and died intestate March 7, 1933; intervenor Forrest Kunze being her surviving spouse.

The substance of plaintiff's petition is that R. P. Rasmussen died testate, seized of the real estate in controversy, that said decedent left a last will and testament which named a devisee, since deceased, and that the said real estate is owned by the plaintiff and the defendants in certain fractional portions set out in the petition. The plaintiff and defendants in the petition are the persons who would constitute the collateral heirs of R. P. Rasmussen and the predeceased wife of R. P. Rasmussen, and the petition allots to the heirs of R. P. Rasmussen the ownership of an aggregate of one-half and to the heirs of his predeceased wife the ownership of an aggregate of one-half of all said real estate. Afterwards a petition of intervention was filed by For-

rest Kunze individually and as administrator of the estates of Richard Lee Kunze and Dorothy Ann Kunze, deceased, alleging in substance that intervenor Forrest Kunze is the administrator of the estates of the decedents just named, who died on March 7, 1933; also alleging that intervenor is the father and sole heir at law of said decedents Richard Lee Kunze and Dorothy Ann Kunze, and is the surviving spouse of Irene Kunze, mother of said two decedents, and that Irene Kunze on March 7, 1933, predeceased the said Richard Lee Kunze and Dorothy Ann Kunze. That the said Richard Lee Kunze and Dorothy Ann Kunze were twins, and were the children and only heirs at law of said Irene Kunze. That said Irene Kunze was the daughter and only heir at law of said R. P. Rasmussen, and that the will of said R. P. Rasmussen has been duly probated and that by the terms of said will the said R. P. Rasmussen bequeathed all his property to his daughter, Irene Kunze, and that by reason said Irene Kunze having predeceased said testator, and by reason of the provisions of said will, the heirs at law of said Irene Kunze, to wit, the said Richard Lee Kunze and Dorothy Ann Kunze inherited the property bequeathed and devised to the said Irene Kunze by the will of said R. P. Rasmussen. That the intervenor Forrest Kunze is the sole heir at law of Richard Lee Kunze and said Dorothy Ann Kunze, both deceased, and as such sole heir at law he is the owner of all property bequeathed by the said R. P. Rasmussen to the said Irene Kunze, and, as such, he is the absolute owner in fee simple of all the real estate described in plaintiff's petition. That the plaintiff and defendants in plaintiff's petition are not the owners of any of the real estate described in said petition. Said petition of intervenor prays that plaintiff's petition be dismissed and that plaintiff and defendants named in plaintiff's petition be decreed to have no interest in any of said real estate, and that intervenor Forrest Kunze be decreed to be the absolute owner in fee simple of all said real estate, and that his title be quieted. There was a petition of intervention also filed by Minnie Wehrman, administratrix with will annexed of the estate of R. P. Rasmussen, deceased, praying that she be given the right as such administratrix to collect the rents, issues, and profits from said real estate. The collateral heirs of R. P. Rasmussen were a brother and the children of two deceased sisters, all of whom reside in Denmark, and for convenience they will hereafter be referred to as the Danish heirs. The collateral heirs of the

deceased wife of R. P. Rasmussen are her brothers and sisters and the children of a deceased brother, and for convenience they will be hereafter referred to as the American heirs.

The pleadings, as the case was tried to the court, presented but one issue for determination, namely, Was the intervenor Forrest Kunze, and Forrest Kunze, as administrator of the estate of Richard Lee Kunze and Dorothy Ann Kunze, owner of the real estate in question, or did this real estate belong to the plaintiff and the defendants named in her petition?

■■ Before considering this question we will advert to another matter before us for determination, resulting from the findings and decree of the trial court. Specifically, what is referred to is the fact that the trial court made a finding in its decree that: "Since the will of R. P. Rasmussen left to his daughter, Irene Rasmussen Kunze, the same estate and same interest in his property as she would have taken by descent if the devise had not been made, under the rules laid down in Re Estate of Warren, 211 Iowa 940, 234 N. W. 835, that the devise in said will, or the provisions thereof, would lapse and become null and void, and that the brother and nephews and nieces of R. P. Rasmussen would inherit said property as though no will had ever been made." Based on this finding, the decree established the title in the Danish heirs exclusively, and quieted the title in them against the American heirs and the intervenor Forrest Kunze, individually and as administrator. This decree determined all issues by applying to the will in question the rule of law that a devise to an heir at law is void, if it gives precisely the same estate that the heir would take by descent if the particular devise was omitted from the will, the title by descent having, in that case, precedence to the title by devise. This rule of law has been frequently recognized by this court. But it is equally true that we have repeatedly held that the rule has no application unless the property devised is identical with the property that would have been inherited had the devise been omitted from the will. In Re Will of Watenpaugh, 192 Iowa 1178, 1181, 186 N. W. 198, 199, appellants sought to establish that the widow took under the statute of descent as the worthier title, instead of under the will, seeking to apply the rule of law we are discussing. In that opinion this court said:

"If it be true that, under the terms and provisions of the

will, the widow of the testator, if she had survived him, would have taken under the will *exactly* the share in the estate of the testator which she would have taken under the statute, had there been no will, then it follows that she would have taken such share by descent, and not by devise or purchase.'' (Italics supplied.)

This court held, however, that this widow took by devise because the property devised was not identical with the share of the estate allowed under the statute of descent, on account of the fact that, in addition to the one-third provided by law, the widow, had she survived testator, would have received under the will the income from the remaining two-thirds of the estate during her lifetime. It was held that the heirs of this legatee who predeceased the testator were entitled, under section 3281 of the Code of 1897 (now Code 1931, section 11861), to at least so much of the entire estate bequeathed to the predeceased legatee as was in existence and available to them at the time of the death of the testator. In Re Estate of Davis, 204 Iowa 1231, 213 N. W. 395, decedent devised to his wife one-third of the net estate. It was held that this devise, so far as it pertained to decedent's real estate, was not identical with the widow's statutory distributive share, being a third of the net instead of the gross real estate. It was held that the equitable conversion of real estate into personalty, through the terms of the will, did not obviate this lack of identity, but of itself destroyed the identity claimed as between testamentary and statutory provision. It was held that the heirs of the widow who predeceased the testator took the property under the devise. In our opinion, there is no reason for extending this rule of law beyond its original application to devises that were of property *exactly identical* with the property the heir or spouse would have received by the laws of descent or the laws of distribution. In our opinion, the district court was in error in holding that the property devised to Irene W. Kunze was identical with her inheritance. The requirement of the will that the beneficiary pay $50 for upkeep of cemetery lot, if she took under the will, makes it impossible to say that her interests under the will and under the law of descent were exactly identical. It is no answer that under section 10213-a1 of the 1931 Code the probate court might have allowed and set apart from the estate a sum sufficient to provide an income adequate to per-

petually pay for the care and upkeep of the cemetery lot, because there is no certainty the probate court would have exercised this discretion at all, nor any certainty as to what amount would have appealed to the probate court, had it exercised its discretion, and there is no certainty that the perpetual care had not been otherwise provided, in which event, under this statute, the court would make no provision. In the Rasmussen will there is also a provision of the payment of $1 ''if anyone claim to be my lawful wife at my dead.'' The district court likewise overlooked the possibility of such a construction of the Rasmussen will as to render exempt property liable for the debts of the estate. We conclude that the district court should have held that the devise to Irene Kunze was not made nugatory by the rule of law upon which the court relied, but was valid and effective. It is not necessary to consider the further contention of the American heirs and the intervenor, that, under the issues and evidence and express stipulations of all parties, including the Danish heirs, all parties conceded that they were claiming under the bequest to Irene W. Kunze in the Rasmussen will, and that the court erred in failing to determine the matter upon the issues and stipulations of the parties as made by them in that respect.

■■■ The remaining issue for determination, namely, whether the intervenor Forrest Kunze, in his personal capacity, and in his capacity as administrator of the estates of Richard Lee Kunze and Dorothy Ann Kunze, was the owner of the real estate in question, or whether the real estate belonged to the American heirs and the Danish heirs as heirs of R. P. Rasmussen and his predeceased wife, the parents of Irene Kunze, depends for its solution upon a question of fact. That question of fact is whether Richard Lee Kunze and Dorothy Ann Kunze, or either of them, survived their mother Irene Kunze, thereby inheriting as her heir or heirs the property devised by R. P. Rasmussen to their mother, Irene Kunze.

On March 6, 1933, Irene Kunze was taken to a hospital in Newton, Iowa, suffering from a toxemia of pregnancy, in a dropsical condition, her body swollen; she was observed and treated by physicians and early in the afternoon of the next day her physician and surgeons prepared to perform a Cæsarean section for the purpose of relieving her of her condition of pregnancy. A spinal anæsthesia was administered, and within 5 to 7 minutes Mrs. Kunze showed signs of collapse, and in about 1 or 2 min-

utes her breathing stopped. Oxygen and hypodermic stimulation was administered and artificial respiration resorted to, but within 8 or 10 minutes from the first signs of collapse she was pronounced dead. No abdominal incision had yet been made. Five or six minutes after her death the surgeon started the making of an abdominal incision in the body of Irene Kunze for the purpose of saving the unborn children if possible, and within two or three minutes thereafter the surgeon delivered through this incision the bodies of twin children, one of each sex. Thus the delivery was accomplished about fifteen or sixteen minutes after the administration of the anæsthesia. As each child was removed through the incision the surgeon who was operating handed the child to an assisting physician who held the child by the feet while the umbilical cord was clamped and severed by the surgeon, and the child was then placed in a sterile sheet held by a nurse. Each child was then removed by a nurse to another room, the surgeon and doctors thereafter having no further contact with the children. The surgeon who did the operating and two assisting physicians, all present during this operation, testified as witnesses for the American and Danish heirs. One of the assisting physicians was standing at the head of Mrs. Kunze, paying particular attention to her condition, and otherwise taking no active part in the procedure. He testified that on account of particularly watching Mrs. Kunze he observed very little with reference to the children, but heard no cry and saw no breathing or pulsations. He testifies that he saw and observed these children, and, observing them in the manner mentioned, he is unable to state with any certainty whether they were alive or dead at the time they were taken from the mother's body because often a child is so asphyxiated when it is delivered that it gives no gross evidence of life at that time. He testifies that from what he saw there was no gross evidence of life. The surgeon who operated testified in substance that as he took each child from the incision he clamped and severed the cord while the child was held by the feet by an assisting physician standing near him, and that he observed no effort at respiration and no pulsation in the cord, based on which facts he testified it is his opinion that the children were dead when taken from the mother. He further testified that the bodies of the children appeared fully developed, plump, and viable; that usually in case of children delivered through Cæsarean section, and not infre-

quently in the case of children naturally delivered, it is necessary to work on them to make them breathe. He testified that he made no examination of the children to detect heart tones; that he performed the operation because he thought there was a possibility of the children being alive; that he made no effort to detect any heart sounds or tones with the stethoscope. He also testified as follows:

"Q. Of your own personal knowledge you don't know whether there was any independent heart beating or heart beats after the cord was severed or not? A. No sir.

"Q. And you would not be able to say that they lived or did not live, from the time they were delivered until they were pronounced dead? A. No sir."

The assisting physician who stood near the surgeon and actively took part in the procedure testified substantially as follows: That Irene Kunze had been examined by him on the day before the operation and he found she was suffering from very marked toxemia of pregnancy. That a very short time before Mrs. Kunze was taken to the operating room, in an examination with a stethoscope, he did not detect any heart tones of the fœtus, and testified that in spite of that fact the fœtus might have been living. That the toxemia would have a deleterious effect on the unborn child. He did not observe any evidence of life in the body of either child, observed no breathing, nor pulsations or heart beats, nor any cry or sign of vocal cords. He testifies, however, that he doubts whether he had an opportunity to observe any pulsations in the bodies, but could have observed breathing. He testified that he and the surgeon had surgical gloves on their hands while handling the children. He testified that, in order that a child may live, there should be some sign of respiration in a child's body within seven or eight minutes from delivery. He testified that he made no examination of the children with the stethoscope, and his knowledge is based only on the inspection he made as the bodies of the children were delivered, and that they looked as though they were dead and in his opinion there was no life in either body after the making of the incision, but he states that this is his opinion only; that he does not know absolutely.

Immediately after each child was placed in a sterile sheet held by a nurse it was taken by a nurse into another room where

the nurses used the ordinary methods of resuscitation. They injected alpha lobelia, tried to clear out the larynx, tried to blow breath from the body of the nurse into the child's body, used artificial respiration by doubling the child back and forth and immersion in hot and cold water. These two nurses were offered by the American and Danish heirs as witnesses. One of these nurses testified that she did not see either child breathe, but is unable to remember whether she observed or felt any pulse or heart beats in either child. She worked in the efforts to resuscitate for twenty to thirty minutes. She testified that during that period she did not know that the child was dead. She testified that she is unable to say whether it was dead or alive during that period, and that all she can say is that she cannot remember whether the heart was beating or whether it was not beating. She testified that she was unwilling to say whether the baby was dead until twenty minutes after it was handed to her. She testifies that she does not remember that she used a stethoscope or other instrument to hear heart beats, and does not remember doing anything in particular by which she could determine whether the baby's heart was beating or not.

The other nurse supposed to have been engaged in efforts to resuscitate the children testified that she does not recall having observed any breath or pulse or heart beats in the child on which she was working. Her testimony is of slight weight, however, as she says she does not distinctly remember handling one of the children and is assuming that she did so, but she has no recollection about it. Another nurse who took no part in attempting to resuscitate the children, but who was in the operating room, testified that she observed no breathing or heart beats or pulsations or cries; that she did not handle either child, and was principally engaged in taking care of the instruments, sponges, and gauzes.

The intervenor Kunze offered as expert witnesses three physicians. One of them testified that all children delivered by Cæsarean operation have to be resuscitated, the child starting respiration with difficulty, and must be aided; that when first removed such child has no indication of respiration; that the thing that determines whether the child is living or dead when delivered is whether or not his heart is beating. That the pulsation of the cord is nothing more or less than the flow of blood from the fœtus pushing the blood back into the placenta; that

the failure to find pulse in the cord has nothing to do with the question of the child being alive; that most obstetricians, after the completing the delivery, and before the cord is cut, wait until the cord stops beating before the severance; that a child's heart might be beating without any impulse in the cord. In answer to a hypothetical question, which substantially embodied the facts relied on by the collateral heirs, this witness testified that in his opinion it was possible that either or both of these children might have been alive after delivery. He testified that a child in the uterus has many more red cells in his blood than the normal individual, a surplus store of oxygen being thereby supplied. Another of these physicians offered by intervenor testified that the heart of a new born child will continue to beat for several minutes before there is any respiration; that the absence of pulsation in the umbilical cord when the child is first delivered would not be a positive indication that there was no life in the child, because as a matter of fact obstetricians do not clamp the cord until pulsation ceases; however, if there was pulsation you would know there was life; that when pulsation has ceased it indicates that the child has advanced far enough that he can depend on his own respiration for a livelihood, or else that the heart is so weak that you cannot feel it; that the oxygen supply in the blood would be sufficient for the child if the mother had been dead eight or ten minutes. Another of intervenor's physician witnesses testified that the probability of a child surviving delivered by Cæsarean method as long as fifteen or twenty minutes after the death of mother would be practically 100 per cent. Answering a hypothetical question, embodying in substance the facts relied upon by the American and Danish heirs, this witness testified that, assuming these facts to be true, the babies were alive, in his opinion.

█▌█ The functioning, or beating, of the heart of an infant, after delivery, establishing an independent circulation of the blood, has been approved by this court as the criterion by which is determined whether the infant ever acquired existence as an individual being. State v. Winthrop, 43 Iowa 519, 22 Am. Rep. 257. Also see In re Stuertz Estate, 124 Neb. 149, 245 N. W. 412, 413. Whether there was functioning of the heart of either child was susceptible of very positive determination by the physician in attendance; but nothing was attempted or done in that respect. The evidence is that there was not even the use of a

stethoscope, after the delivery of these infants. This leaves the question of fact, as to the individual existence of either infant, dependent on a record full of uncertainty as to the evidentiary value of its various component parts.

Of importance, under such a record, is the matter of burden of proof. The district court, at the outset of the trial, ruled properly in placing the burden on the American and Danish heirs. These heirs were seeking partition, basing their title upon inheritance through the deceased parents of the deceased devisee, Irene Kunze. As heirs they belong in a deferred class. They had a right to inherit only as a class substituted for other classes of more nearly related heirs. These classes of more nearly related heirs, if in existence, would have taken the property through Irene Kunze to the exclusion of the American and Danish heirs. It was then incumbent on the American and Danish heirs to affirmatively show that as a deferred class of heirs there existed no heirs of any classes having a priority right to inherit. In Anson v. Stein, 6 Iowa 150, this duty was recognized by this court in the following language:

"Where a party claims as heir, he must first establish, affirmatively, his relationship with the deceased; and secondly, negatively, that no other descendant exists to impede the descent to the plaintiff."

Consequently, in viewing the evidence, the question to be determined is whether the American and Danish heirs have proved by the greater weight of the evidence that neither of the infants in question attained individual existence after delivery.

These children, in their fœtal state, certainly possessed life at the time the period of pregnancy was more than eight months expired, and likely at a time when the period of pregnancy was nearing its end; otherwise the infants would not have attained their state of conceded full development. Afterwards, twenty or thirty minutes after delivery, the lives of the two infants were extinct. It is in harmony with the principle laid down in Seeds v. Grand Lodge A. O. U. W., 93 Iowa 175, 61 N. W. 411, and in harmony with common experience, to assume that the fœtal life continued, and after delivery merged into the individual life of the child and continued until the fact of death is established. So we think the specific burden rested on the American and Dan-

ish heirs to establish that death intervened before individual existence became a fact.

To review at length all the evidence in the record is not practical. But, to point out that the record goes a long way to affirmatively establish that the infants had independent existence, determined by the criterion we have already mentioned, we refer as briefly as possible to the following matters. The bodies of the two infants were well developed, plump, and viable, that is, livable, having the appearance of being able to live; twenty to thirty minutes was expended by professional nurses in efforts to assist the infants to establish respiration; frequently children born by means of a Cæsarean section, and not infrequently children naturally born, fail to establish visible respiration for a period of several minutes, during which period the child may have established independent circulation; no action whatever was taken by any of the physicians or nurses to ascertain the specific fact of the beating of the heart in either infant, their knowledge and opinion being based on their general observations; their discovery of heart beats would have been accidental, or at least incidental, to the things they were doing in accomplishing their main purpose, that is, the saving of the lives of the infants, rather than the establishing of the technical facts involved in their right to inherit property; the nurses who worked to establish respiration in the infants testify they cannot remember whether they discovered heart beats or whether they did not discover heart beats, but made no stethoscopic investigation. There is the testimony, offered by the collateral heirs, of the surgeon and doctors present at the operation, who, with the opportunity and knowledge above described, express the opinion that the infants when delivered were without life. However, one of these physicians stated that of his personal knowledge he did not know whether there was or was not independent heart action after the cord was severed, and would not be able to say that the infants lived or did not live from the time they were delivered until the time they were pronounced dead. Another of these physicians stated that his opinion was based on the fact that he observed no gross evidence of life, that is, he heard no cry and saw no breathing or pulsations, and he states that these observations were insufficient to enable him to state with any certainty, whether the infants were dead or alive, when delivered, because often a child is so asphyxiated when delivered that it gives no

gross evidence of life at that time, but may be living. The third one of these physicians, the surgeon who operated, admittedly paid but little attention to the condition of the infants; his attention being directed primarily to the body of the mother. There is one statement in the record of more specific information on the part of one of these physicians, that is, his testimony that shortly before the operation he examined the fœtal heart and failed to detect any heart tones, but he says in spite of such failure life may have existed in the fœtus.

 The collateral heirs offered in evidence the certificate returned by one of these physicians to the clerk of the district court showing the death of Irene Kunze, and that there was a delivery of stillborn twins by abdominal incision after her death, and also the records in the office of said clerk, in which appears the names of Dorothy Ann Kunze and Richard Lee Kunze, with date of death shown as being March 7, 1933, and under the caption "cause of death" appearing the word "stillborn." These records are presumptive evidence of the facts therein stated, as provided by section 2431 of the Code. The fact as to which the presumption would arise is that the infants were stillborn. That the word "stillborn" has reference to an infant making no outcry at birth, showing no visible respiration, and exhibiting no voluntary movement of its muscles, although there may have been independent heart action, may have been the legislative intent. This is somewhat sustained by section 2405 of the Code providing: "A stillborn child shall be registered as a birth, and also as a death." The word "deadborn" was not used by the legislature, but the more generalized and inclusive word "stillborn." However, we do not need to determine the legislative meaning of the word "stillborn" because, in any event, the presumption arising from this statute is only of such probative value as it has in connection with the entire record in this case. It is not an ancient record valuable because of the loss of the specific facts, which in this case we have before us, for all of which reasons, as an item to be considered, its weight as evidence is not impressive. The records offered by the collateral heirs in the estate of Irene Kunze in which appellant Forrest Kunze stated that her father, R. P. Rasmussen, was the heir at law of Irene Kunze, constitute admissions made by the intervenor Kunze against his interests. Likewise, he admits making the statement after the death of his wife that he did not know

whether there was any life in the children. These admissions of Kunze would have had considerable weight in the event that at the time of the admissions he had the definite knowledge as to the infants having had technical independent existence, but under the record as it stands, that was such an uncertain fact that the admissions have a corresponding lack of weight against him, amounting substantially to an acknowledgment on his part that he had not solved the difficult question now before this court.

Without extending discussion, and upon the entire record, we are of the opinion that the American and Danish heirs have failed to establish, by the greater weight of the evidence, that neither of the infants in question had such independent and individual existence as entitled one or both to inherit from their mother. The district court should have established the title to the real estate, of which R. P. Rasmussen died seized, in intervenor Forrest Kunze, as sole heir of the deceased infants, subject to such rights as he had in said real estate to administer same in his capacity as their administrators. The fractional interest owned by defendants Farmers & Merchants Savings Bank of Durant, Iowa, and D. W. Bates, superintendent of banking, as receiver of said bank, in a certain tract of land described in the decree, was established by the district court, from which portion of the decree no appeal was taken, and the same stands unaffected by this reversal.

No error is shown in the dismissal of the petition of intervention of Minnie Wehrman, administratrix C. T. A. of the estate of R. P. Rasmussen, deceased.

The decree appealed from is reversed, excepting only that it is affirmed on the appeal of Minnie Wehrman, administratrix C. T. A. of the estate of R. P. Rasmussen, deceased.

Reversed in part; affirmed in part.

ANDERSON, C. J., and ALBERT, DONEGAN, and PARSONS, JJ., concur.

SUPPLEMENTAL OPINION.

RICHARDS, J.—■■■ In the original opinion it was held that the district court should have established the title to the real estate of which R. P. Rasmussen died seized in the inter-

venor Forrest Kunze, as sole heir of the deceased infants Richard Lee Kunze and Dorothy Ann Kunze, subject to the conceded interest therein of D. W. Bates, as Superintendent of Banking. On the original submission the American and Danish heirs depended their claims of interest in this real estate on a single fact issue; that is, the survival or nonsurvival by one or both of the above-mentioned two infants after the decease of Irene Kunze. Adopting as determinative this issue as made and presented by all parties in the court below, and here, we determined this fact issue and the opinion was an expression of our findings thereon. In their petition for rehearing the American and Danish heirs now take the position that the fact issue they presented was wholly immaterial to the case. They now claim that in view of the construction given Code section 11861 in McAllister v. McAllister, 183 Iowa 245, 167 N. W. 78, and in Re Hulett's Estate, 121 Iowa 423, 96 N. W. 952, it is immaterial whether the deceased infants survived their mother and attained independent existence. They now say that whatever the facts may have been as to surviving their mother, the infants did not, as heirs of their mother Irene Kunze, take the property devised to her by the testator Rasmussen, because the infants were not in existence at the time of the subsequent date of the testator's death. That this contention is supported by the cited cases must be conceded. But although petitioners now point to three or four lines of their citation of authorities, wherein are to be found cited the McAllister and Hulett cases, there appeared nowhere any argument upon the point now raised, in petitioners' original briefs and arguments, which were voluminous. We look on the contention now made as not a matter presented on this appeal prior to the petition for rehearing. It is a well-established rule that a new case cannot be made on a petition for rehearing, nor can matters be then insisted upon which were not presented to the court in the original case. Long v. Garey Investment Co., 135 Iowa 398, 112 N. W. 550. The original opinion determined the issues and theories on which the case was submitted in the district court and in this court. The petition for rehearing is an abandonment by petitioners of their original position that the determination of the appeal depended on certain facts. They now claim such facts in no way determine the issue. Regardless of what might have been the outcome on this appeal had petitioners presented in the original submission the matters now for the first time

argued, we see no reason for making an exception to the above-mentioned rule so many times laid down. In the other matters argued in the rehearing petition we find no reasons for granting a hearing.

The petition for rehearing is overruled.