698 P.2d 712

Jack SUMMERFIELD and Charlene Summerfield, husband and wife, individually, and as surviving parents of Baby Girl Summerfield, Petitioners,

v.

SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA, Hon. Marilyn A. Riddel, a judge thereof, and James Colleen, M.D., and Jane Doe Colleen, husband and wife, and Richard Lott, M.D. and Jane Doe Lott, husband and wife, real parties in interest, Respondents.

No. 17607–SA.

Supreme Court of Arizona, En Banc.

April 24, 1985.

Friedl & Richter by Joseph C. Richter, Phoenix, for petitioners.

Teilborg, Sanders & Parks by Frank A. Parks, Phoenix, for respondents.

Arizona Trial Lawyers Assoc., Langerman, Begam, Lewis & Marks by Amy G. Langerman and William B. Revis, Chairman, amicus curiae Committee, Phoenix, for amicus curiae.

Haralson, Kinerk & Morey by Carter Morey, Denneen L. Peterson, Tucson, for amicus curiae: Erickson.

FELDMAN, Justice.

This case presents the question of whether a wrongful death action can be maintained by the Summerfields (plaintiffs), the parents of a viable fetus that was stillborn as a result of alleged medical malpractice by the respondent real parties in interest (defendants). The trial court granted the defendants' motion to dismiss the wrongful death count on the authority of *Kilmer v. Hicks*, 22 Ariz.App. 552, 529 P.2d 706 (1974), a case which held: 1) that no common law right existed for recovery, and 2) that a viable fetus was not a "person" as that word is used in A.R.S. § 12–611, the statute which authorizes the institution of a damage action against one whose "wrongful act, neglect or default" causes the "death of a person." Plaintiffs then filed this special action, asking us either to distinguish *Kilmer* on its facts or to overrule it.

## SPECIAL ACTION RELIEF

In Arizona relief by "Special Action" replaces that which was previously obtained by use of prerogative writs such as certiorari, mandamus, and prohibition. Rule 1, Ariz.R.P.Sp.Act., 17A A.R.S. We generally accept jurisdiction of petitions for special action only where the issues raised are such that "justice cannot be satisfactorily obtained by other means." *King v. Superior Court*, 138 Ariz. 147, 149, 673 P.2d 787, 789 (1983). In the situation at bench, there are several pending cases in the superior courts which present the same issue. Normal appellate procedures will result in unnecessary cost and delay to all litigants. *See State v. Superior Court*, 123 Ariz. 324, 329–30, 599 P.2d 777, 782–83 (1979). The question presented is a clear issue of law with obvious statewide significance. The congruence of these factors militates in favor of our accepting jurisdiction. *See State ex rel. Corbin v. Pickrell*, 136 Ariz. 589, 591, 667 P.2d 1304, 1306

(1983). We therefore take jurisdiction pursuant to Ariz. Const. art. 6, § 5(4), and Rule 1, Ariz.R.P.Sp.Act., 17A A.R.S.

### FACTS

On review of a dismissal for failure to state a claim, the truth of the allegations must be assumed. *Donnelly Constr. Co. v. Oberg/Hunt/Gilleland,* 139 Ariz. 184, 186, 677 P.2d 1292, 1294 (1984). Taken in this light, the facts follow: Mrs. Summerfield became pregnant in October, 1980. In November, she consulted defendants for prenatal care. At that time she disclosed a history of diabetes; the doctors told her that there was nothing to worry about, and performed no special tests. On June 10, 1981, Mrs. Summerfield informed the doctors that she no longer felt fetal movement. She was examined, reassured that all was well, and sent home. She continued to note the absence of fetal movement, and went back to one of the doctors on June 18. This time the doctor could not detect any fetal heartbeat, and admitted Mrs. Summerfield to the hospital, where she was delivered of a 37-week old, stillborn fetus. The causes of fetal death, according to hospital records, were diabetes and toxemia of pregnancy.

On June 16, 1983, the Summerfields filed a malpractice action against the attending doctors. Count Three of the complaint was a claim for wrongful death. Defendants filed a motion to dismiss the count, arguing that *Kilmer v. Hicks, supra,* had held that the right to recover for wrongful death was purely statutory, and that a fetus was not a "person" as that term was used in A.R.S. § 12–611. The trial judge granted the motion to dismiss upon the express authority of *Kilmer.*

Plaintiffs first contend that the rule of *Kilmer v. Hicks, supra,* is inapplicable to this case because the facts are distinguishable. *Kilmer* was an automobile accident case in which the mother was killed and the full term fetus died of fetal anoxia resulting from pre-partum maternal death. By contrast, in the case at bench, the defendants had undertaken a direct duty of care

to the fetus as well as to the mother and, plaintiffs contend, should be held liable to each for breach of the duty. We agree that the foreseeable risk of harm imposed such a dual duty upon the defendants. *See Ontiveros v. Borak,* 136 Ariz. 500, 508, 667 P.2d 200, 208 (1983). We do not believe, however, that this answers the question. The rule of non-liability espoused by *Kilmer* and the cases which it cites (22 Ariz. App. at 553–54, 529 P.2d at 707–08) is not based upon society's perception that the doctors have no duty to care for the fetus, but upon alleged common law and statutory limitations on the legal remedy for breach of that duty. The question before us is whether such limitations do exist and, if they do, whether they must or should be left intact by this court.

Much of the argument presented by the parties is directed to the interpretation they claim should be given the wrongful death statute. The reason for this focus is that both sides begin from the premise that the exact words of the statute must govern because the common law did not recognize a cause of action for wrongful death. Since the statute contains no explicit directions, the argument that we must rely on its precise wording does more to obscure than to illuminate the problem. More importantly, we are by no means certain that the common law made no provision for such a cause of action. We commence our analysis, therefore, with a brief reference to the evolution of the common law rule with respect to the right of a survivor to maintain an action for the death of the victim. In so doing, we seek to determine whether we are truly bound by legislative intent or are free to apply a modicum of common law policy.

### ACTIONS FOR WRONGFUL DEATH: THE COMMON LAW REMEDY

This court has followed many others in stating that recovery for wrongful death is purely a creature of statute, there being no recovery at common law. *See, e.g., Huebner v. Deuchle,* 109 Ariz. 549, 514 P.2d 470 (1973); *Estate of Lister,* 22 Ariz. 185, 195

P. 1113 (1921). The first recorded judicial pronouncement on the question appeared as dicta in *Baker v. Bolton,* 1 Camp. 493, 170 Eng.Rep. 1033 (Nisi Prius 1808), where Lord Ellenborough stated that "[i]n a civil court, the death of a human being could not be complained of as an injury." It is possible that this was merely a restatement of the principle that the action for injuries did not survive the death of the injured person. *See* Holdsworth, *The Origin of the Rule in Baker v. Bolton,* 32 L.Q.Rev. 431, 434–35 (1916). More probably, the *Baker* pronouncement was a product of the felony-merger rule—a doctrine that disallowed civil recovery for an act that constituted both a tort and a felony. *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 383, 90 S.Ct. 1772, 1778–79, 26 L.Ed.2d 339 (1970).[1]

In America, the *Baker* rule was ignored until 1848; during this forty-year period, there was "no instance of a denial of a civil action for wrongful death." *Malone, supra,* at 1066–67. It was not until the decision in *Carey v. Berkshire R.R.,* 55 Mass. 475, 48 Am.Dec. 616 (1848), that an American court held that no cause of action for wrongful death existed at common law. Other courts followed, citing *Baker* and *Carey* to support their holdings, even though the felony-merger doctrine, on which *Baker* depended, was rejected by all courts as having no application in America. *Moragne, supra,* 90 S.Ct. at 1779. In Arizona, the merger doctrine was expressly abrogated. *See* A.R.S. § 12–611 (permitting the tort action even though the act causing the death was homicide).

■ It appears, therefore, that reliance on *Baker* as the basis for lack of recovery at common law may be misplaced, especially in light of this court's statement that the common law

means the unwritten or common law of England, together with the acts of parliament of a general nature, and not local to Great Britain, which had been passed and were enforced *at the time of ... separation [of the colonies] from the mother country* so far ... as they are suitable to ... wants, conditions, and circumstances [in Arizona.]

*John W. Masury & Son v. Bisbee Lumber Co.,* 49 Ariz. 443, 463, 68 P.2d 679, 688 (1937) (emphasis added). Since it is not at all clear that the common law prevalent in England in 1776 was as later stated in *Baker,* and since, in any case, the doctrinal underpinning of *Baker* was unavailable in this country, we cannot be totally certain that the "common law" adverted to in A.R.S. § 1–201 as "the law of decision in the courts of this state" precludes recovery for wrongful death.

In England the *Baker* rule was reversed by the passage of the Fatal Accidents Act of 1846 (Lord Campbell's Act), which allowed certain near relatives of the decedent a cause of action against the tortfeasor. The state legislatures in the United States followed suit and enacted statutes patterned after Lord Campbell's Act. The United States Supreme Court stated in *Moragne, supra,* that these statutes reflect a legislative policy which "has become itself a part of our law, to be given its appropriate weight not only in matters of statutory construction *but also in those of decisional law.*" 398 U.S. at 390–91, 90 S.Ct. at 1782 (emphasis supplied). The Supreme Judicial Court of Massachusetts, which had been the first to adopt the *Baker* rule, followed the reasoning in *Moragne* and declared that "the law in [that] Commonwealth [had] evolved to the point where it may now be held that the right to recovery for wrongful death is of common law origin ..." *Gaudette v. Webb,* 362 Mass. 60, 71,

---

**1.** Professor Malone's scholarly research reveals that in early times the proceeding for accidental killing was both civil and criminal in nature, its purpose being to discourage a blood feud. Malone, *The Genesis of Wrongful Death,* 17 Stan.L. Rev. 1043, 1055 (1965). In fact, the accidental killing of a human being was a compensable

wrong even before the Norman Conquest. 1 F. Pollock & F. Maitland, *The History of English Law* 48 (2d ed. 1898). In time, it became futile to sue the tortfeasor-felon because he was put to death on account of the killing and his property escheated to the crown. *Id.* at 351.

284 N.E.2d 222, 229 (1972). Using this rationale, and deeming it "appropriate for the judiciary to make changes in the common law," the same court held that a still-born, viable fetus was a "person" for purposes of the wrongful death statute. *Mone v. Greyhound Lines, Inc.*, 368 Mass. 354, 358–59, 361, 331 N.E.2d 916, 918, 920 (1975).

■ Even if our legislature believed that it was creating a new statutory right of action in enacting the Wrongful Death Acts, there is no evidence to suggest that it intended to occupy the field completely, thus leaving no room for future judicial initiative. *Cf. Justus v. Atchison*, 19 Cal.3d 564, 139 Cal.Rptr. 97, 565 P.2d 122 (1977) (where the court based its conclusion that the legislature had intended to occupy the field on the fact that the California legislature had regulated the remedy in great detail over the years). Our first wrongful death statute was enacted in 1887. Rev.Stat.Ariz. § 2145 *et seq.* (1887). It stated that the action was to be for the sole and exclusive benefit of the surviving spouse, children or parents, and allowed the jury to award damages proportionate to the injury, dividing them among the beneficiaries as it saw fit. In 1901, the statute was revised (Rev.Stat.Ariz.Civ.Code § 2764 *et seq.*) to permit the personal representative of the deceased to institute the suit, omitting thereby any enumeration of statutory beneficiaries. In addition, the statute allowed the jury to award such damages as it deemed "fair and just," up to a maximum of $5,000, and dictated its distribution according to the laws of intestacy. The 1901 statute was construed as creating an action for the benefit of the estate. *Southern Pacific Co. v. Wilson*, 10 Ariz. 162, 169, 85 P. 401, 403 (1906). The same statute was adopted with minor modifications in 1913, 1928 and 1939 [Rev.Stat.Ariz.Civ.Code §§ 3372–76 (1913); Ariz.Rev.Code §§ 944–46 (1928); Ariz.Code §§ 31–101 to –103 (1939)], except that the limitation on recovery was abolished after the adoption of the

Arizona Constitution.[2] In 1956, when the statute was again amended, it reverted almost to the original, providing that the action would be for the benefit of the surviving spouse, child or parent, or, if none of these survived, for the estate. The amount recovered was made subject to debts and liabilities in the event that the action was brought on behalf of the estate. A.R.S. §§ 12–611 to 613 (1956). It seems, then, that aside from identifying the beneficiaries of the action, the legislature has not occupied the field so fully as to preclude judicial development. The phrases "such damages as are fair and just," "with reference to the injury ... to the surviving parties" and "mitigating and aggravating circumstances" (A.R.S. § 12–613) invite the court to participate in construing the statutes and setting the parameters of the action.

Indeed, the courts have actively entered the field. For example, it has been held that the word "shall" in the phrase "shall give such damages" is permissive and not mandatory. *State v. Sanchez*, 119 Ariz. 64, 579 P.2d 568 (App.1978). Similarly, Arizona courts have allowed the jury to consider loss of companionship, comfort and guidance, *Boies v. Cole*, 99 Ariz. 198, 407 P.2d 917 (1965), survivor's mental suffering, pain and shock, *City of Tucson v. Wondergem*, 105 Ariz. 429, 466 P.2d 383 (1970), emotional problems of children caused by loss of the father, *Southern Pacific Transportation Co. v. Lueck*, 111 Ariz. 560, 535 P.2d 599 (1975), and decedent's prospective earning capacity, *Kemp v. Pinal County*, 8 Ariz.App. 41, 442 P.2d 864 (1968), as elements in the calculation of damages, notwithstanding the fact that these factors are not mentioned in the statutes. In *Boies v. Cole, supra*, this court held that the words "the jury shall give ... damages ... having regard to the mitigating or aggravating circumstances attending the wrongful act ..." made provision for the award of punitive damages. 99 Ariz. at 204–05, 407 P.2d at 921. The *Boies*

---

**2.** Article 18, § 6 of the Arizona Constitution forbids the legislature from setting any limit on personal injury damages. *See also* Ariz. Const. art. 2, § 31.

court did not consider the fact that the legislature could have used the explicit words "exemplary or punitive damages" if such was its intent. These judicial determinations would have been totally inappropriate if the legislature had intended to foreclose judicial initiative in this area. *See* Note, *Wrongful Death and the Stillborn Fetus: A Common Law Solution to a Statutory Dilemma,* 43 U.Pitt.L.Rev. 819, 831–32 (1982). These and further judicial clarifications and divinations of legislative meaning[3] make it clear that our courts have not contented themselves with passive application of the exact wording of the wrongful death statutes.

■ This excursion into common law history and principle does *not* necessarily lead us to the conclusion that a wrongful death action is recognized at common law, nor that such an action should be allowed irrespective of legislative intention or pronouncement. We need not solve that problem. We can conclude, at a minimum, that statute and precedent have combined to produce a cause of action with common law attributes. The common law may participate in the growth and evolution of a statutorily created action, especially where its pronouncements do not constitute "drastic or radical incursion[s] upon existing law," or directly contradict either legislative words or expressed legislative intention. *Mone v. Greyhound Lines, Inc.,* 368 Mass. at 359, 331 N.E.2d at 918–19.

We believe the principle was well-expressed by Justice Tobriner, concurring in *Justus v. Atchison, supra:*

> In enacting the wrongful death statute, our Legislature probably initially conceived that it was creating a right of recovery unknown to the common law. But from this premise alone, I am unable to divine an affirmative legislative intent to preclude further judicial development. I find nothing in the statute or its history which anticipates and forbids the evolution of recovery for wrongful death into a universally recognized right of common law status. Judicial expansion and refinement of legal concepts characterizes the common law—any legislative intent to foreclose such traditional judicial activity should require positive expression. ... Just as "a statute is not an alien intruder in the house of the common law" (Stone, *The Common Law in the United States* (1936) 50 Harv.L.Rev. 4, 15), so too the evolving common law should be a welcome guest to domains previously thought statutory.

19 Cal.3d at 586, 139 Cal.Rptr. at 111–12, 565 P.2d at 136–37. The same principle is implicit in our adoption of both *statutory* and *decisional* English law as "common law." *John W. Masury & Son v. Bisbee Lumber Co., supra.*

■ In concluding that common law principle and policy must play a role in the interpretation of this statute, we do not retreat from the concept expressed in *Bowslaugh v. Bowslaugh,* 126 Ariz. 517,

---

**3.** Other decisions have rounded the corners of the statute, filled in the gaps, or applied common sense to prevent absurdity. It has been held, for instance, that both surviving children and parents can recover because the statute is to be interpreted in the conjunctive, even though written in the disjunctive. *Hurt v. Superior Court,* 124 Ariz. 45, 601 P.2d 1329 (1979). We have held that the party bringing the action does so on behalf of, and as "statutory trustee" for, all other beneficiaries of the action, even though the statutes contain no such provision. *In re Estate of Milliman,* 101 Ariz. 54, 415 P.2d 877 (1966). Part of the 1956 statute was written out of the law by the court of appeals when it held that the requirement that the proceeds of the action must be distributed to the surviving beneficiaries in the proportions "provided by law"

for intestate succession (§ 12–612(C)) could not be harmonized with the provisions of § 12–613 which required damages to be assessed according to the loss sustained by each survivor. It therefore held that § 12–612(C) was applicable only when the action was brought by and on behalf of the estate, even though the statute contained no such provision or limitation. *Lombardo v. Pollock,* 21 Ariz.App. 537, 521 P.2d 636 (1974). Such a construction was required as a "common sense" interpretation which "harmonizes" a discrepancy between the method of computing and distributing damages. *Id.* at 539, 521 P.2d at 638. Indeed, the legislative amendment of § 12–612(C) in 1973 did change the statute—to just what the court of appeals said the statute had meant before the amendment.

617 P.2d 25 (1979). Special legislative intent may control where the action arises from statute, where the legislature's intent, purpose and policy are clearly expressed, and where the cause of action is not protected by art. 18, § 6 of our constitution.[4]

### THE STATUTORY REMEDY

We come, then, to the main issue presented: the correct interpretation of the word "person" in the wrongful death statute, which states, in pertinent part:

When death of a *person* is caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action to recover damages in respect thereof, then, and in every such case, the person who would have been liable if death had not ensued shall be liable to an action for damages; ...

A.R.S. § 12–611 (emphasis added).

Both parties urge us to interpret the statute by application of the usual hermeneutical techniques or principles that courts utilize to divine legislative meaning. The first of these principles is that the words used in the statute must be given the meaning they had in common law at the time the statute was enacted. Thus, we are told that the word "person" in A.R.S. § 12–611 does not encompass a fetus because at common law a fetus was not considered a "person." Since the statute is claimed to be in derogation of common law, this argument also does more to state the problem than to solve it. More importantly, however, we note that the alleged common law distinction between a fetus and a "person" is not an explicitly stated principle at all, but one *deduced* from the widely-held belief that at common law one could not be prosecuted for murder for killing a fetus. *Keeler v. Superior Court*, 2 Cal.3d 619, 87 Cal.Rptr. 481, 484, 470 P.2d 617, 620 (1970); Means, *The Phoenix of Abortional Freedom*, 17 N.Y.L.F. 335, 336 (1971). As Justice

Holmes noted, however, there may be some doubt that it was murder even where the fetus was born alive and then died of the injury suffered in the womb, a common law result which might not be doubtful today. *Dietrich v. Inhabitants of Northampton*, 138 Mass. 14, 15, 52 Am.Rep. 242, 243 (1884). In any case, we believe that the analogy between civil liability for tort and criminal liability for causing death is not apt. As Justice Holmes stated:

For, even if Lord Coke's statement [that there is criminal liability if the infant dies after birth] were the law of this Commonwealth, the question would remain whether the analogy could be relied on for determining the rule of civil liability. Some ancient books seem to have allowed the mother an Appeal for the loss of her child by a trespass upon her person.... But no case, so far as we know, has ever decided that, if the infant survived, it could maintain an action for injuries received by it while in its mother's womb.

*Id.* (citations omitted). From the last premise stated, Holmes deduced that no action would lie for the wrongful death of a nonviable fetus. *Id.* at 17, 52 Am.Rep. at 245. Despite its portrayal of the conflicting views reflected in the common law, *Dietrich* has been cited continually for the proposition that a wrongful death action could not be maintained by the survivors of a viable, stillborn fetus. Defendants argue that the *Dietrich* doctrine was in the minds of the members of the Territorial Legislature of 1887 when they enacted our first wrongful death act. It is possible, however, that the legislature was also aware of principles contained in an earlier doctrine:

When men strive together, and hurt a woman with child, so that there is a miscarriage, and yet no harm follows [to her], the one who hurt her shall be fined, according as the woman's husband shall lay upon him; and he shall pay as the judges determine. If any harm follows

4. This issue was neither raised, argued nor considered.

[to her], then you shall give life for life. . . .

*Exodus* 21:22.

■ In our view, it is most likely that the legislature never adverted to the fetus/person issue when it passed Arizona's first wrongful death statute. We do not assume that the Territorial Legislature of 1887 was necessarily supplied with or interested in the erudite reasoning or thorough research which supported Holmes' decision, made three years earlier. The solution to this problem cannot be found in a methodology which requires us to assume or divine a legislative intent on an issue which most probably was never considered. Rather, the solution must be found in a study of the statute, the best method to further the general goal of the legislature in adopting such a statute, and common law principles governing its application.

*The Requirement that the Deceased Be Able to Maintain an Action*

■ One of the prerequisites for recovery under this statute is the ability of the injured party to maintain an action if death had not ensued. This requirement has "reference not to the nature of the loss or injury but merely to the circumstances under which the injury arose and the nature of the wrongful act, neglect or default complained of." *Barragan v. Superior Court,* 12 Ariz.App. 402, 405, 470 P.2d 722, 725 (1970). The question, then, is: Would the fetus have been entitled to maintain the action had it lived?

■ One of the bases of Holmes' decision in *Dietrich* (quoted, *ante,* at 719) was that no case had allowed an infant, injured in the womb, to maintain an action if it survived. It should be noted that this is no longer the law. The cases now agree, with relative unanimity, that such an action may be brought by an infant who survives birth. *See* W. Prosser and W.P. Keeton, The Law of Torts § 55, at 368 (5th ed 1984); Annot., 40 A.L.R.3d 1222 (1971). However, the right of a stillborn infant to maintain such an action still remains subject to disagreement, because it is not clear that a right to

sue exists either at the time of the injury or at the time of death.

■ The Missouri Supreme Court answered this question by holding that "the statute does not condition recovery upon the existence of [such] a right, . . ." but, instead, permits an action at *any time* during the life the injured would have had if death had not ensued. *O'Grady v. Brown,* 654 S.W.2d 904, 910 (Mo.1983). But for the injury, the child would have been born and entitled to recover, so the *O'Grady* court held that the survivors could recover for the death of the viable fetus. *Id.* at 911. *See also Evans v. Olson,* 550 P.2d 924 (Okla.1976). We agree with the Supreme Court of Missouri that the statutory prerequisite is satisfied by plaintiff's decedent.

*Legislative Goals*

Our legislature has not defined the word "person" as used in A.R.S. § 12–611. Given the present state of medical science, we cannot say that the word "person" unambiguously includes or excludes a viable fetus. *See Commonwealth v. Cass,* 392 Mass. 799, 467 N.E.2d 1324 (1984). It is therefore this court's responsibility to determine whether a 37-week old fetus is a "person" for the purposes of our wrongful death statute.

The disagreement regarding whether the word subsumes a viable fetus stems also from *Dietrich v. Inhabitants of Northampton, supra.* Justice Holmes argued that a fetus was a part of its mother, not an independent biological entity. *Id.* 138 Mass. at 16, 52 Am.Rep. at 245. For sixty years, this statement was uniformly recognized as law. The first crack in the doctrine occurred in 1946 when a federal court held that a viable fetus was not merely a part of its mother, and was, indeed, a "person" with standing to maintain an action for injury inflicted during its removal from the womb. *Bonbrest v. Kotz,* 65 F.Supp. 138 (D.D.C.1946). The Court noted that the *Dietrich* case involved a non-viable child, whereas the case before it concerned a viable one:

As to a viable child being "part" of its mother—this argument seems to me to be a contradiction in terms. True, it is in the womb, but it is now capable of extrauterine life.... it is not a "part" of the mother in the sense of a constituent element.... Modern medicine is replete with cases of living children being taken from dead mothers ...

*Id.* at 140.

In enacting the wrongful death statute of 1887, and in returning to its terms under the present statute, the legislature explicitly recognized the legal right of the *survivors* to be compensated for *their loss* resulting from the victim's death (ante, at 7). So far as compensation is concerned, there may be a quantitative but not a qualitative difference between the damage caused by the death of a newborn and that of a viable fetus; the damages reflect the same right of the parents—to recover the loss due to the death of their child.

Aside from the remedial objective of compensating survivors, we also discern, in other areas of the law, a legislative goal of protecting the fetus. It is a felony to cause the death of an unborn child knowingly or recklessly by any physical injury to the mother which would be murder if the mother died. A.R.S. § 13–1103(A)(5). We note that this statute is in the section traditionally associated with the killing of persons (manslaughter) and that it refers not to a fetus but to an unborn "child." The death of an unborn child is considered to be an aggravating circumstance for purposes of sentencing. A.R.S. § 13–702(D)(10). A physician performing an abortion on a viable fetus is constrained to take all reasonable steps to preserve the life and health of the fetus. A.R.S. § 36–2301.01(C). The legislature even continues to re-enact statutes criminalizing abortion, despite the ruling by the United States Supreme Court in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) declaring such statutes unconstitutional. *See* A.R.S. § 13–3603 *et seq.* The property laws also provide protection for fetuses. *See, e.g.,* A.R.S. § 14–2108.

■ This evidence of an overall legislative policy of compensation and protection militates in favor of construing the wrongful death statute to give parents a remedy when their viable child is negligently killed. It also seems more sensible to permit recovery by the survivors of a viable fetus than to impose an artificial cutoff by permitting recovery if the injured child survives or is born alive and then dies, but prohibiting recovery for anyone if the viable child fails to survive through the moment of delivery. Such a narrow construction of "person" would not only deny compensation to the survivors, but would also run contrary to an apparent legislative objective of providing protection for the fetus. It seems preferable, in other words, to construe the statute in light of the evil(s) it was designed to remedy. *O'Grady v. Brown, supra.*

Such a construction also places Arizona with the majority. At present, thirty-two jurisdictions recognize a cause of action for wrongful death when a viable fetus is stillborn as a result of tortious negligence.[5]

5. The court in *Verkennes v. Corniea,* 229 Minn. 365, 38 N.W.2d 838 (1949) was the first to allow an action for the death of a stillborn, viable fetus. Today, thirty-one other jurisdictions recognize such an action. *Eich v. Town of Gulf Shores,* 293 Ala. 95, 300 So.2d 354 (1974); *Hatala v. Markiewicz,* 26 Conn.Supp. 358, 224 A.2d 406 (1966); *Worgan v. Greggo & Ferrara, Inc.,* 50 Del. 258, 128 A.2d 557 (1956); *Simmons v. Howard University,* 323 F.Supp. 529 (D.D.C.1971); *Porter v. Lassiter,* 91 Ga.App. 712, 87 S.E.2d 100 (1955); *Volk v. Baldazo,* 103 Idaho 570, 651 P.2d 11 (1982); *Chrisafogeorgis v. Brandenberg,* 55 Ill.2d 368, 304 N.E.2d 88 (1973); *Britt v. Sears,* 150 Ind.App. 487, 277 N.E.2d 20 (1971); *Dunn v.*

*Rose Way, Inc.,* 333 N.W.2d 830 (Iowa 1983); *Hale v. Manion,* 189 Kan. 143, 368 P.2d 1 (1962); *Mitchell v. Couch,* 285 S.W.2d 901 (Ky.1955); *Danos v. St. Pierre,* 402 So.2d 633 (La.1981); *State ex rel. Odham v. Sherman,* 234 Md. 179, 198 A.2d 71 (1964); *Mone v. Greyhound Lines, Inc.,* 368 Mass. 354, 331 N.E.2d 916 (1975); *O'Neill v. Morse,* 385 Mich. 130, 188 N.W.2d 785 (1971); *Rainey v. Horn,* 221 Miss. 269, 72 So.2d 434 (1954); *O'Grady v. Brown,* 654 S.W.2d 904 (Mo.1983); *White v. Yup,* 85 Nev. 527, 458 P.2d 617 (1969); *Poliquin v. MacDonald,* 101 N.H. 104, 135 A.2d 249 (1957); *Salazar v. St. Vincent Hosp.,* 95 N.M. 150, 619 P.2d 826 (1980); *Hopkins v. McBane,* 359 N.W.2d 862 (N.D.1984);

Only ten jurisdictions (including Arizona, per *Kilmer v. Hicks, supra*) do not recognize such a cause of action unless live birth takes place.[6] Thus, the statement in *Kilmer v. Hicks, supra*, that only a minority of courts allow the action, no longer holds true.

We recognize, of course, that standing with the majority is not a goal in and of itself. It is well to join the majority only when the majority rule is based on good legal policy. As a matter of common law, we believe this to be the case here. The theoretical underpinnings of the *Dietrich* rule have been eroded, and both it and *Gorman v. Budlong*, 23 R.I. 169, 49 A. 704 (1901), the other early case which gave support to the rule of non-recovery, have been overruled by the very courts which decided them. *See Mone v. Greyhound Lines, supra; Presley v. Newport Hospital*, 117 R.I. 177, 365 A.2d 748 (1976).

 The majority rule, which now recognizes that a death action will lie under the circumstances present here, acknowledges that the common law has evolved to the point that the word "person" does usually include a fetus capable of extrauterine life. The majority also recognizes that the common law now holds that if the fetus survives it may recover for injuries sustained in the womb. The common law now also permits a death action if the infant survives birth and then dies from injuries sustained in the womb. The majority finds no logic in the premise that if the viable infant dies immediately before birth it is not a "person" but that if it dies immediately after birth it is a "person."

 We take note, further, that the magic moment of "birth" is no longer determined by nature. The advances of science have given the doctor, armed with drugs and scalpel, the power to determine just when "birth" shall occur. We believe that the common law now recognizes that it is the ability of the fetus to sustain life independently of the mother's body that should determine when tort law should recognize it as a "person" whose loss is compensable to the survivors. We acknowledge, of course, that this, too, is an artificial line, difficult at times to determine. It is not possible to draw any line without being arbitrary to some extent. Nevertheless, we believe that with regard to the issue of recognizing a loss to the survivors, viability is a less arbitrary and more logical point than the moment of birth. The moment of viability may be difficult to prove in those few cases where that moment and the tortious injury are temporally close. We do not believe, however, that a just remedy should be denied in all cases simply because proof may be difficult in a few. *Chrisafogeorgis v. Brandenberg*, 55 Ill.2d 368, 371–72, 304 N.E.2d 88, 90 (1973).

*Does Roe v. Wade Prohibit the Instant Action?*

Defendants argue that a common law interpretation of the word "person" to include any fetus is contrary to the principles expressed by the United States Supreme Court in *Roe v. Wade, supra*, where the

*Stidam v. Ashmore*, 109 Ohio App. 431, 167 N.E.2d 106 (1959); *Evans v. Olson*, 550 P.2d 924 (Okla.1976); *Libbee v. Permanente Clinic*, 268 Or. 258, 518 P.2d 636 (1974); *Presley v. Newport Hospital*, 117 R.I. 177, 365 A.2d 748 (1976); *Fowler v. Woodward*, 244 S.C. 608, 138 S.E.2d 42 (1964); *Nelson v. Peterson*, 542 P.2d 1075 (Utah 1975); *Vaillancourt v. Medical Center Hosp.*, 139 Vt. 138, 425 A.2d 92 (1980); *Moen v. Hanson*, 85 Wash.2d 597, 537 P.2d 266 (1975); *Baldwin v. Butcher*, 155 W.Va 431, 184 S.E.2d 428 (1971); *Kwaterski v. State Farm Mutual Auto Ins. Co.*, 34 Wis.2d 14, 148 N.W.2d 107 (1967).

**6.** The following jurisdictions maintain that a wrongful death action is not maintainable for the death of an unborn viable child. *Kilmer v. Hicks*, 22 Ariz.App. 552, 529 P.2d 706 (1974); *Justus v. Atchison*, 19 Cal.3d 564, 139 Cal.Rptr. 97, 565 P.2d 122 (1977); *Hernandez v. Garwood*, 390 So.2d 357 (Fla.1980); *Egbert v. Wenzl*, 199 Neb. 573, 260 N.W.2d 480 (1977); *Graf v. Taggert*, 43 N.J. 303, 204 A.2d 140 (1964); *Endresz v. Friedberg*, 24 N.Y.2d 478, 301 N.Y.S.2d 65, 248 N.E.2d 901 (1969); *Gay v. Thompson*, 266 N.C. 394, 146 S.E.2d 425 (1966); *Scott · v. Kopp*, 494 Pa. 487, 431 A.2d 959 (1981); *Hogan v. McDaniel*, 204 Tenn. 235, 319 S.W.2d 221 (1958); *Lawrence v. Craven Tire Co.*, 210 Va. 138, 169 S.E.2d 440 (1969).

Court held that a fetus is not a "person" for the purposes of the Fourteenth Amendment. We do not find this argument persuasive. The word "person" can mean different things in different contexts. *O'Grady v. Brown*, 654 S.W.2d at 909. More importantly, *Roe v. Wade* balances the rights of the fetus against the rights of its mother and concludes that the latter's right to privacy outweighs the former's right to life in the first trimester of pregnancy; it "neither prohibits nor compels" the inclusion of a fetus as a person for the purposes of other enactments. *See generally* Kader, *The Law of Tortious Prenatal Death Since Roe v. Wade*, 45 Mo.L.Rev. 639 (1980).

▇ We believe that the abortion question is not relevant to the issues before us. *See Toth v. Goree*, 65 Mich.App. 296, 312, 237 N.W.2d 297, 305 (1975) (Maher, J., dissenting). Right or wrong, it is one thing to hold that in the first trimester the mother's rights outweigh those of the fetus so that she may voluntarily terminate the pregnancy, but a very different thing to say that after the fetus has achieved viability the pregnancy may, with impunity, be terminated *against* the mother's will. Thus, while we recognize the binding authority of *Roe v. Wade*, we do not believe that allowing recovery to the parents of a tortiously killed, viable fetus negates the pronouncement in *Roe* that the state has an interest in the fetus after viability. In fact, it may further the policy of *Roe* by permitting the state to protect "a woman's right to continue her pregnancy by recognizing [recovery] ... for harm caused by interference with that right." *Kader, supra*, 45 Mo.L.Rev. at 664.

*Legislative Action or Inaction*

▇ The last volley in defendants' arsenal is the observation that legislative inaction following the denial of recovery in *Kilmer* should be taken to imply satisfaction with the decision. While legislative inaction following an authoritative opinion by this court may militate in favor of defendants' position, the same is not true when the matter in question has never been before this court. *Calvert v. Farmers' Insurance Co.*, 144 Ariz., 291, 296, 697 P.2d 684, 689 (1985).

▇ The defendants also point out that the legislature has considered several bills advocating recovery for the wrongful death of a viable stillborn fetus, but that these have never been enacted into law. We do not agree with this argument. These measures were but minor parts of bills which primarily involved the regulation of abortion. A representative sample of the type of bills in question can be obtained by simply looking at the title of one:

### House Bill 2220

Relating to public health and safety; PROVIDING THAT "PERSON" INCLUDES UNBORN CHILD FOR PURPOSES OF WRONGFUL DEATH SUITS; PRESCRIBING DEFINITION OF "PERSON" TO INCLUDE UNBORN CHILD FOR PURPOSES OF CRIMINAL OFFENSES; providing for certain immunities for refusal to do certain acts relating to abortion and prohibiting discrimination against certain persons and entities for such refusal; prescribing certain remedies; providing for exemption; PROVIDING FOR REGULATION OF ABORTION PROCEDURES; prescribing certain definitions; PRESCRIBING PERSONS AND FACILITIES AUTHORIZED TO PERFORM ABORTIONS; PRESCRIBING DUTY OF PHYSICIAN TO PROVIDE CERTAIN INFORMATION TO WOMAN BEFORE ABORTION; PRESCRIBING WRITTEN CONSENT OF WOMAN AND NOTICE TO PARENTS OF MINOR BEFORE PERFORMING ABORTION; providing for certain exceptions; PROHIBITING ABORTION OF LIVE FETUS AFTER CERTAIN TERM; PROVIDING FOR DUTY TO PRESERVE LIFE AND HEALTH OF LIVE FETUS; PROVIDING FOR CERTAIN RECORDS RELATING TO ABORTION; PROVIDING FOR WARDSHIP OF

LIVE FETUS; providing for certain pathological examination; PROHIBITING CERTAIN EXPERIMENTATION; PROVIDING FOR DUTY TO DISPOSE OF REMAINS OF UNBORN CHILD; providing for birth control instruction to the natural father; providing for inspection of abortion facilities and prescribing requirements of such facilities relating to counseling; PROHIBITING CERTAIN COMPENSATION FOR ABORTION REFERRAL; PROHIBITING DISTRIBUTION OF ABORTIFACIENTS; providing for certain exceptions; PROVIDING FOR certain limitations and PROHIBITIONS OF GOVERNMENT SUPPORT FOR ABORTION and family planning; providing for certain requirements of health insurance contracts that provide coverage for abortion; ....

We are not blind to the raging controversy over the abortion question. The issues release deeply held moral and religious feelings; in such an atmosphere one's convictions about the role of tort law in molding responsible public behavior necessarily take a back seat to the moral dilemma of abortion. Thus, there is strong reason to doubt that the small portion of the bill which contained the proposed amendment to the wrongful death statute "received the degree of independent consideration that such legislation might deserve." Note, *supra*, 43 U.Pitt.L.Rev. at 834 n. 91.

## CONCLUSION

We conclude, therefore, that to defer to some assumed legislative intent is to abdicate judicial responsibility. The legislature has neither spoken nor acted on the issue; its silence should not be taken as an indication of its intention. In the meantime, the law has evolved and the issue of recovery for tort damage to the fetus has come within the province of common law development.

 We hold, therefore, that absent a clear and definitive demonstration of legislative intent to the contrary, the word "person" in the wrongful death statutes (A.R.S. § 12–611 *et seq.*) encompasses a stillborn,

viable fetus. By upholding the right of recovery, we join the majority and better reasoned view. *Kilmer v. Hicks*, 22 Ariz. App. 552, 529 P.2d 706 (1974) is hereby disapproved. Petitioner's prayer for relief is granted. The trial court's order dismissing the wrongful death action is vacated.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.