Ruth Ilene BENNETT, Appellant
(Defendant below),

v.

The STATE of Wyoming, Appellee
(Plaintiff below).

No. 3087.

Supreme Court of Wyoming.

Jan. 11, 1963.

Mrs. Brooke Wunnicke, Cheyenne, and Joseph F. Maier, Torrington, for appellant.

Norman B. Gray, Atty. Gen., W. M. Haight, Deputy Atty. Gen., and George J. Argeris, Asst. Atty. Gen., Cheyenne, Stanley K. Hathaway, County and Pros. Atty., Torrington, for appellee.

Before PARKER, HARNSBERGER and McINTYRE, JJ.

Mr. Justice McINTYRE delivered the opinion of the court.

The defendant, Ruth Ilene Bennett, was convicted of manslaughter in connection with the killing of her newborn baby. On appeal to this court she contends the evidence failed to prove the corpus delicti beyond a reasonable doubt.

▪ To establish the corpus delicti in a prosecution for the killing of a newborn child two elements must concur. These elements are (1) that the infant was born alive and (2) that death was caused by the criminal agency of the accused. These ingredients of crime must be proved beyond reasonable doubt and can be established by direct or circumstantial evidence. People v. Ryan, 9 Ill.2d 467, 138 N.E.2d 516, 518; State v. Osmus, 73 Wyo. 183, 276 P.2d 469, 476; Annotation 159 A.L.R. 523.

*First Element—Born Alive (A Human Being)*

Dr. W. O. Brown of Scottsbluff, Nebraska, the pathologist who performed an autopsy on the body of the dead baby, testified the child was a full-term and fully-matured infant. Dr. H. B. Rae, county health officer of Goshen County, also testified the baby was fully and normally developed and a full-term infant. In addition, Dr. Brown expressed the opinion from his examination and tests that the child was born alive. The basic reason for his opinion was that there was quite adequate evidence the child had breathed. He said the most reliable indication as to whether a baby was born alive is whether it has breathed or not.

There is quite a respectable line of authority for the proposition that it is not sufficient in infanticide cases to prove the child breathed but that an independent circulation and existence of the child must be shown. See Annotation 159 A.L.R. 523, supra. In that connection attorneys for Mrs. Bennett suggest that foremost in persuasiveness is the Wyoming case of State v. Osmus, supra.

They argue that the decision in the Osmus case follows this line of authority and that Wyoming has committed itself to the proposition that proof of an independent circulation and existence of the child is necessary in cases such as the one here involved. We find nothing in the decision, however, which would warrant an assumption that such a position has been taken for our jurisdiction, and it would appear the attorneys are reading something into the opinion which is not in fact there.

The author of the Osmus-case opinion, Chief Justice Blume, at 276 P.2d 476, noted that the courts in England have struggled with the question involved for centuries. He also mentioned the annotation in 159 A.L.R. 523 wherein it is shown that it is necessary to prove both that the infant was born alive and that death was caused by the criminal agency of the accused. He then commented that we shall "cursorily" examine the first of these requirements.

After such an examination and without deciding whether the first requirement had been met, the writer said let us not linger any longer in discussing the foregoing requirement; let us "assume" there was sufficient evidence to show the infant was born alive and pass to the question as to whether the evidence shows beyond a reasonable doubt the defendant was the criminal agency in killing the infant. The conclusion of the court on this latter question was that either the infant died of natural causes, or at least that the testimony failed to show the contrary. The case was reversed for that reason and not for failure to prove a live birth.

But we are now concerned with what was said in the Osmus case regarding the requirement of proof that the child was born alive. In the court's cursory review with respect to this requirement, a quotation was made, without approval or disapproval, from 2 Wharton's Criminal Evidence, § 874 (11th Ed.), to the effect that in infanticide an independent circulation and existence of the child must be shown, and the fact of the child having breathed is not "conclusive"

proof that it was born alive. A quotation to the same effect, still without approval or disapproval, was also made from People v. Hayner, 300 N.Y. 171, 90 N.E.2d 23, 25.

Following these quotations, Justice Blume pointed out we have not had any satisfactory answer to the question, either out of medical books or in the cases that have been considered by the courts, as to when an independent circulation exists.

■ This comment of the Chief Justice becomes particularly significant in the case now before us because appellant complains of the refusal of the trial court to give an instruction to the jury containing the following language: "It is the law that an independent circulation and existence of the baby must be proved, and the fact of the baby having breathed is not conclusive proof that it was born alive."

The proposed instruction would be confusing to a jury because it gives no standard for determining when an independent circulation exists. Moreover, "conclusive proof" is not to be required with respect to any of the elements of the offense charged. See Singleton v. State, 33 Ala.App. 536, 35 So.2d 375, 378.

In the instant case, the propriety of refusing the instruction offered is pointed up in an answer made by Dr. Brown to a question as to whether he had any knowledge that would indicate whether this child had established an independent circulatory system. His response was, "What do you mean by 'independent circulatory system'?"

Thus, it was apparent an expert witness could not know what lawyers and courts might or might not mean in speaking of an independent circulation and existence of the baby. And yet, the witness was a doctor of medicine with a specialty of pathology. In addition to postgraduate work and 21 years of practice in his specialty, he had for several years been Associate Pathologist at the University of Illinois and had taught at a school of medicine. During the practice of his specialty, he had performed between 5,000 and 6,000 autopsies including approximately 1,000 upon babies. Some of these autopsies had involved determinations as to whether or not the baby had been born alive.

If, as Chief Justice Blume pointed out in the Osmus case and Dr. Brown indicated in his testimony in this case, there is no satisfactory answer to the question as to when an independent circulation exists, then it could not be expected that a jury could pass upon that question, at least without specific advice as to when such a circulation does exist. On the other hand, the essence of the issue we are discussing is whether the child was born alive. In that regard the jury was clearly instructed that the state is called upon to prove beyond a reasonable doubt that the child was born alive.

■ Whether the baby involved in this case was born alive was a question of fact for the jury, and the opinion of the autopsy physician was evidence which could be considered by the jury. People v. Chavez, 77 Cal.App.2d 621, 176 P.2d 92, 95. Dr. Brown was definite and positive in his testimony and testified without qualifying his opinion that "It [the child] was born alive." Being asked whether there was any doubt in his mind that the baby was born alive, he answered "No." Also, as we have already mentioned, both he and Dr. Rae described the child as a full-term and fully-matured infant. In addition, the evidence showed that a woman's stocking was wrapped twice around the neck of the child and tied tightly in a knot. Dr. Brown said the stocking was very tight—so tight that it produced deep gouges in the tissue of the neck and completely obstructed the windpipe.

The pathologist followed through from the outward signs of this stocking, in his autopsy examination of the neck, and found a very marked constriction of the soft tissue of the neck with complete collapse of the windpipe under the stocking, so that the windpipe was completely constricted. He said it would have been impossible for the child to have breathed after the stocking was placed around its neck and in his opinion it died from asphyxiation produced by the strangulation. Here too, the doctor had

no doubt in his mind that the baby died of strangulation.

██ Circumstantial evidence may be used to prove both the corpus delicti and the connection of the accused with a crime. 22A C.J.S. Criminal Law § 604, p. 410. The jury then, in the instant case, would be justified in believing, if it chose to do so, this child had been born alive or otherwise there would have been no reason for the efforts to strangle it. See Jackson v. Commonwealth, 265 Ky. 295, 96 S.W.2d 1014.

██ Admitting there could be a possible doubt with respect to this phase of the case, we cannot agree there was necessarily a reasonable doubt. The evidence on a whole was sufficient to justify the inference that the baby here involved had been born alive and had become a human being. The jury's implied finding to that effect rests upon a factual basis and not upon speculation.

*Second Element—Criminal Agency*

Proof that the death of an infant was brought about by the criminal agency of the accused usually cannot be established by direct evidence. In most cases this element of the corpus delicti must be proved by circumstantial evidence. Annotation 159 A.L. R. 523, 531. In any event, it is agreed by all of the parties that the state's proof concerning this element of the corpus delicti, in the case at bar, rests solely on circumstantial evidence. The question we have for determination is whether it was sufficient to justify a verdict of guilty.

The appealing defendant complains that the state "paraded" 13 lay witnesses for the purpose of testifying they thought defendant was pregnant up to May 10, 1961 and not thereafter. Not only was Mrs. Bennett described by these witnesses in such a manner as to warrant a belief beyond reasonable doubt that she was pregnant, but some of the witnesses described her condition and actions in such a manner as to justify the further conclusion that the time for her child to be born was at hand on May 10. Pictures were also introduced in evidence which showed defendant's appearance prior to May 10.

Additionally, there were witnesses who testified to admissions on the part of defendant that she was pregnant. According to one witness, she would not say what arrangements she was making for care when the child was born, and according to at least two witnesses she admitted being pregnant and later denied she was. It was apparent that Mrs. Bennett was separated from her husband and that she and two children belonging to her were sharing a basement apartment with Miss Kathleen Young.

On Sunday, May 7, 1961, defendant took the children to an orphanage where they were left. On Wednesday, May 10, she worked at her usual place of employment as a beauty operator. However, she became sick and went home early with Kathleen Young. Her explanation to her employer was that she had started her menstrual period. A woman customer of the shop testified defendant gave evidence of deep pain and went home without finishing a manicure she had started. Thursday, May 11, was defendant's day off and she did not work at the beauty shop on that day.

The testimony of Kathleen Young, corroborated to some extent by Glen Hansen who took care of the apartment property and took meals with Mrs. Bennett, accounted for the whereabouts and actions of Mrs. Bennett from the time she went home Wednesday afternoon and throughout Thursday, except for intervals when she was alone either in the back bedroom of the apartment or in the bathroom. She retired about 10:30 p.m., sleeping alone in the back bedroom for the first time. From about 1:00 to 1:30 a.m. she and Miss Young ate some soup together, and then from 1:30 a.m. on Mrs. Bennett was again alone in the back bedroom. She called Miss Young about 9:00 a.m.

Both of the witnesses, Miss Young and Hansen, verified they saw no baby born and had no part in such an affair and also that no other person was in the apartment except for them and Mrs. Bennett. Be-

ginning on Thursday, things were observed by Kathleen Young which had not been observed prior to Wednesday night and which would go to prove Mrs. Bennett had given birth to a child. For example, sanitary napkins with blood on them were seen in the bathroom and back bedroom. Miss Young verified they were not hers. There was also blood on defendant's nightgown and some of her clothing and big spots of blood on the bedspread which she used for the first time Wednesday night. In addition there was a blouse belonging to defendant which had stains in the breast area.

On the whole the evidence, depending upon the jury's view of it, could satisfy a jury beyond any reasonable doubt that defendant gave birth to a baby and disposed of it without it being seen or heard by either Miss Young or Hansen. On Thursday, Mrs. Bennett's day off, the city's garbage truck gathered trash in the part of town in which the Bennett-Young apartment is located. The truck was emptied at the city dump just before quitting time, and on the following morning, Friday, May 12, the body of the baby in question was found on top of the last load of trash. It was partially burned from the burning of trash at the dump.

On Saturday, the day after the baby's body was discovered, Mrs. Bennett was picked up by law enforcement officers for questioning. She was arrested two days later, on May 15, and then formally charged with homicide. She told the officers at the time of questioning on Saturday she had not been pregnant and she had not just had a baby. Stains on her clothing in the breast area were observed. She was asked about these and said she always leaked in the breast when menstruating. She was asked if she would be willing to take a medical examination, and she refused to do so.

Following the arrest of Mrs. Bennett, she was held in the county jail for four months waiting for trial. During the early part of this period close observation was made of sanitary napkins and of clothing which came out for laundry. Blood stains were present in the napkins and on clothing, and there were stains on clothing worn over the breast area. Stains were observed until May 31.

Dr. Brown testified that it is not a normal thing for a woman to show leakage from the breast during menstruation but that such a situation is normally present when there has been a birth. He also stated that it is not a normal situation for a menstrual period to last two and one-half weeks. The period of bleeding, he said, is usually longer in the case of a birth than a normal menstrual period.

The defendant did not testify and no attempt was made on her behalf to explain what had become of the baby she was thought by so many witnesses to have been carrying. In fact, the apparent position taken by her attorneys at the trial and on appeal was that Mrs. Bennett had not been pregnant and that she did not give birth to a child at the time involved. The verdict can only mean the jury was satisfied beyond a reasonable doubt this was not the case.

■■ The jury was entitled to believe, if it chose to do so, that Mrs. Bennett did not tell the truth when she told officers she had not been pregnant and had not recently given birth to a child, and when she said she always secreted in the breast when menstruating. The fabrication of false accounts by an accused criminal for the sake of diverting inquiry or casting off suspicion is a circumstance always indicative of guilt. Commonwealth ex rel. Wright v. Banmiller, 195 Pa.Super. 124, 168 A.2d 925; Commonwealth v. Lewis, 193 Pa. Super. 508, 165 A.2d 98, 100. And in the case at bar, such evidence doubtless helped to convince the jury of defendant's guilt.

■■ In order to make a case for the jury in a criminal case, the prosecution is not required to prove defendant guilty to a mathematical certainty or beyond a possibility of doubt. Affronti v. United States, 8 Cir., 145 F.2d 3, 6. In our opinion the jury had a right to believe beyond a rea-

sonable doubt that the death of the infant referred to in the charge was brought about by the criminal agency of Mrs. Bennett.

*Constitutional Rights*

In connection with a motion for new trial, defendant submitted an affidavit in which it is alleged that the prosecuting attorney in rebuttal argument asked the jury members if they would rather stay in jail for four months instead of submitting to a medical examination, if such examination would prove their innocence. It is argued that this was prejudicial conduct on the part of the prosecutor and that the defendant should be given a new trial on account of it. The prosecutor contends he was merely commenting upon the evidence. Nothing pertaining to the matter appears in the record.

We have already mentioned the fact that there was testimony to the effect that Mrs. Bennett was asked by the officers whether she would consent to a medical examination, and she refused to do so. This evidence was offered and received without objections from the defendant. Furthermore, it is admitted by defendant that no objections were made to the alleged statement of the prosecutor at the time of his rebuttal argument.

We have heretofore announced that if a party considers the conduct of opposing counsel improper, he should at the time voice an objection so the trial court may take steps to rectify the damage if that is possible. Any failure to do so will be considered as a waiver of objections to such conduct. Cavaness v. State, Wyo., 358 P.2d 355, 358–359; State v. Spears, 76 Wyo. 82, 300 P.2d 551, 562; State v. Hambrick, 65 Wyo. 1, 196 P.2d 661, 681–682, rehearing denied 65 Wyo. 55, 198 P.2d 969.

*Concluding Statement*

The evidence was sufficient to establish the corpus delicti beyond a reasonable doubt, both as to the birth of a live child and as to death being caused by the criminal agency of the accused. Also, no other reversible error has been called to our attention. The judgment is therefore affirmed.

Affirmed.

BLUME, C. J., not participating.