342 So.2d 123 (1977)
Morace C. DUNCAN, As Administrator of the Estate of John Norace Duncan, Deceased, Appellant,
v.
John D. FLYNN, M.D., et al., Appellees.
Nos. 76-618, 76-858.
District Court of Appeal of Florida, Second District.
February 9, 1977.
Rehearing Denied February 28, 1977.
Wagner, Cunningham, Vaughan, May & Genders, Tampa, Robert Orseck of Podhurst, Orseck & Parks, and Susan Goldman, Miami, for appellant.
F. Ronald Fraley and John I. Van Voris of Shackleford, Farrior, Stallings & Evans, Tampa, for Flynn and Shelby Mutual Ins. Co.
T. Paine Kelly, Jr. and Claude H. Tison, Jr. of Macfarlane, Ferguson, Allison & Kelly, Tampa, for St. Joseph's Hospital and St. Paul Fire and Marine Ins. Co.
SCHEB, Judge.
Appellant, plaintiff below, is the father of a baby who died during the process of delivery. As administrator, he sued appellees/defendants physician, hospital, and their insurers, for the baby's alleged wrongful death. The trial court entered summary judgments in favor of all defendants. Plaintiff appeals. We affirm.
The significant legal issues presented are: (1) whether the baby was born alive whereby a cause of action accrued in favor of *124 plaintiff; and if not, (2) whether the unborn viable fetus was a "person" on whose behalf suit for wrongful death under Florida's former Wrongful Death Act could be maintained.
Essentially, the facts are these. During pregnancy, Shirley J. Duncan was cared for by the defendant, Dr. Flynn, who practiced obstetrics and gynecology. She was admitted to the defendant hospital on March 20, 1972, for purpose of delivery of her fourth child. Dr. Flynn, who cared for Mrs. Duncan during her previous deliveries, induced labor. By 9:00 p.m. she was completely dilated. She was taken into the delivery room around 10:00 p.m. Minutes later, her baby's head emerged; however, the baby's shoulders were too wide to allow further passage. Two other physicians were summoned to assist, but after unsuccessful attempts at various procedures for some twenty minutes, they noted the fetal heartbeat tones had disappeared. Concluding the child could not be born alive, the physicians then directed their efforts toward Mrs. Duncan's condition. After receiving her husband's permission, they removed the baby's head. Sometime after 11:00 p.m., they proceeded to remove the remainder of the child's body by a Caesarean section. The baby's head and torso weighed 14 pounds, 8 ounces. The death certificate carried "cardio vascular failure due to or as a consequence of strangulation" as the stated cause of death.
By the third amended complaint against the defendants, Dr. Flynn and St. Joseph's Hospital, plaintiff sought to recover for the child's wrongful death. Plaintiff alleged that the defendants' negligent failure to recognize in advance that a Caesarean section would be required caused the death of their baby during the course of childbirth.[1] In entering summary judgments in favor of all defendants, the trial court noted that:
"... there can be no claim for the wrongful death of the unborn fetus, John Norris Duncan, and the court having determined that there are no genuine issues as to any material fact as to that claim which is a part of plaintiff's third amended complaint, that defendants are entitled to a judgment as a matter of law."
We address sequentially the issues posed by this appeal.

Whether the baby was born alive.
Admittedly, the determination of whether or not a birth has occurred is generally a factual one. The trial judge here adjudicated that the defendants were not liable on the defendants' motions for summary judgment. We recognize it was incumbent upon the defendants to remove all doubts as to existence of any genuine issue of material fact on the question of whether birth occurred. Fla.R.Civ.P. 1.510; Holl v. Talcott, 191 So.2d 40 (Fla. 1966).
No Florida cases speak to the precise question of when a live birth occurs. Plaintiff argues that the evidence demonstrated that Mrs. Duncan gave birth to a live baby and, but for the negligence of the defendants, the baby would have continued to live. Plaintiff points to the fact that the baby's head was born spontaneously and that for at least twenty minutes, life existed while the shoulders of the baby were lodged in the mother's pelvis. Plaintiff suggests that the stated cause of death on the death certificate; i.e., "cardio vascular failure due to or as a consequence of strangulation," gives rise to an inference of breathing on the part of the child, and that this is consistent with a live birth having occurred.
Bennett v. State, 377 P.2d 634 (Wyo. 1963), where the defendant was convicted of manslaughter in the killing of her newborn baby lends a measure of support to plaintiff's argument. In Bennett, there was an issue of whether the baby born to the defendant was born alive. In reviewing the testimony from defendant's trial, the court concluded that whether or not there *125 was a live birth was a question of fact for the jury. The court held it was proper for the trial court to have received the expert opinion of the autopsy physician that based upon his examination and tests the child was born alive. The physician supported his opinion by adequate evidence that the child had actually breathed. He opined that the most reliable indicator as to whether or not a child was born alive was whether or not it had breathed. Although there was no direct evidence of breathing on the part of the Duncan baby, plaintiff argues that the fact of the cause of death having been attributed to strangulation gives rise to an inference that some breathing may have occurred.
Plaintiff also points to People v. Chavez, 176 P.2d 92 (Cal. App. 1947), a case involving a prosecution for murder of a newborn baby. There, the court held the evidence that the baby had breathed and the existence of heart action supported the jury's findings that the child was born alive. Chavez has been interpreted by the California Supreme Court as holding that a viable fetus in the process of being born is a human being within the meaning of the homicide statutes. Keeler v. Superior Court, 2 Cal.3d 619, 87 Cal. Rptr. 481, 470 P.2d 617 (1970).
The problem of when a live birth occurs, while novel in Florida, has been addressed by courts in several other jurisdictions. The earliest case brought to our attention is Rex v. Ann Poulton, 5 Carr. & P. 332 (1832), in which the court opined:
"With respect to the birth, the being born must mean that the whole body is brought into the world; and it is not sufficient that the child respires in the progress of the birth."
The English view was generally followed by American courts in early cases. For example, Wallace v. State, 10 Tex. App. 255 (1881), held that a live birth required that the child be expelled alive from its mother's body. This view was followed in Goff v. Anderson, 91 Ky. 303, 15 S.W. 866 (1891), and more recently in People v. Hayner, 90 N.E.2d 23 (N.Y. 1949).
The prevailing view still requires expulsion from the body of the mother, although the more recent cases conclude that no live birth has occurred until the child has been completely expelled and has attained a separate and independent existence. Most of the cases have arisen within context of homicide statutes. An Annotation at 65 A.L.R.3d 413, states:
"... And although it is not always clear whether the courts are trying to explain just what such a `separate and independent existence' denotes physically, or whether they are setting forth elements of proof to be shown in addition to the showing of such existence, there is language expressed in several cases to the effect that `life' is further contingent upon a showing of independent circulation and/or respiration. It is to be noted further that in the few cases considering the question, there appears to be a decided split of opinion as to whether a newborn still attached to the mother by the umbilical cord may be said to possess `life' so as to be the subject of a homicide."
While authorities may be divided on whether it is required for the cord to be severed, the cases generally hold breathing alone is not sufficient to establish live birth. People v. Hayner, supra; Jackson v. Commonwealth, 265 Ky. 295, 96 S.W.2d 1014 (1936); Montgomery v. State, 202 Ga. 678, 44 S.E.2d 242 (1947). While these are criminal cases, the view has also been taken in civil cases that an independent existence from the mother is essential and that this requires that there be an independent circulation of the blood. Cf. Wehrman v. Farmers' & Merchants' Savings Bank, 221 Iowa 249, 259 N.W. 564 (1935).
Recently in Justus v. Atchison, 53 Cal. App.3d 556, 126 Cal. Rptr. 150 (1975), the court recognized Chavez, supra, as standing for the principle advanced by the plaintiff that a viable child in the process of being born is a human being under the homicide statutes. But, the California court pointed out Chavez was a homicide case. Then the court went on to hold that a baby who apparently died during process of delivery *126 or assisted birth was born dead and that an action for wrongful death could not be maintained on his behalf.
We adopt the view that to constitute "live birth" so as to give rise to an action for wrongful death, a child must acquire a separate and independent existence of its mother. This view, we think provides a reasonably definitive test, is logical, and is supported by the authorities. Generally, the requirements of separate and independent existence will be met by a showing of expulsion (or in a Caesarean section by complete removal) of the child's body from its mother with evidence that the cord has been cut and the infant has an independent circulation of blood. Should the death occur prior to the cord being severed, expert medical evidence may be required to determine whether such separate and independent existence had been attained by the infant prior to that time.
We find the evidence before the trial judge conclusively negates that the Duncan baby acquired any separate and independent existence apart from its mother. For even if some breathing had occurred, it is unthinkable to conclude the baby had the required separate and independent existence considering the necessity for the physicians to remove the baby's head before they could even remove its torso from Mrs. Duncan. Therefore, the court was correct in entering summary judgments in favor of Dr. Flynn and St. Joseph's Hospital.

Whether the unborn viable fetus was a "person" under Florida's former Wrongful Death Act.

The right of action for a wrongful death did not exist at common law. Wilkie v. Roberts, 91 Fla. 1064, 109 So. 225 (1926). Florida, however, grants that right by statute. Since the incident which gave rise to plaintiff's suit occurred on March 20, 1972, the action before us is controlled by Sections 768.01 and 768.03, Florida Statutes (1971).
Section 768.01 in the relevant part provides:
"Whenever the death of any person in this state shall be caused by the wrongful act, negligence, carelessness or default of any individual ..." (Emphasis supplied)
Section 768.02 relates to parties and damages. The relevant part of Section 768.03 provides;
"Wherever the death of any minor child shall be caused by the wrongful act, negligence, carelessness or default of any individual ..." (Emphasis supplied)
Thus, the critical question becomes whether the word "person" in Section 768.01 or the words "minor child" in Section 768.03 include a viable full term fetus which has not been born alive.
We think this question is controlled by the opinion of the Supreme Court of Florida in Stokes v. Liberty Mutual Ins. Co., 213 So.2d 695 (Fla. 1968). In Stokes, the parents of a stillborn fetus sought to recover damages for the wrongful death of the fetus due to the negligence of a motorist. Mrs. Stokes was about seven months pregnant at the time of the accident, which occurred on February 27, 1965. The stillbirth occurred on March 4, 1965. The Stokes based their claim on Section 768.03 of the Wrongful Death Act. The court found that an unborn baby was not a "minor child" within the meaning of Section 768.03, which permits recovery for the death of a "minor child" due to a negligent act. Although Stokes involved a stillbirth, the court went on to hold that "a right of action for wrongful death can arise only after the live birth and subsequent death of the child."
Despite the language in Stokes, plaintiff argues that the claim for wrongful death of the Duncan baby is not foreclosed. Plaintiff points to the language in Stokes where the court states;
"We are not here called upon to determine whether the stillborn fetus is a `person' or a `party' under the last two cited sections. The Stokes, rather, insist that a fetus qualifies as `minor child' under Section 768.03." Id. at 698.
*127 Thus, the plaintiff argues for a distinction between a "minor child" as the term was interpreted in the Stokes case and a "person." It is difficult for us to believe that while holding a stillborn fetus was not a "minor child" the Supreme Court intended that such a fetus was to be considered a "person." In fact, the very reasons advanced by the court in Stokes for holding a stillborn fetus not to be a minor child were among those advanced by other courts relied upon in Stokes which held such a fetus not to be a "person."
The question of whether an unborn fetus is considered a person under Florida's new Wrongful Death Act, Sections 768.16 and 768.27, Florida Statutes, has been considered by two of our sister courts. In Davis v. Simpson, 313 So.2d 796 (Fla. 1st DCA 1975), the First District Court of Appeal held that the term "person" does not include a full term viable but stillborn fetus. In so ruling, the court took note of the Stokes decision having preceded the legislature's enactment of the new wrongful death law. The court reasoned that the interpretation in Stokes was then available and if the legislature had intended to make such a radical change in the law, it would have done so in clear language. But, the Fourth District Court of Appeal in Miller v. Highlands Ins. Co., 336 So.2d 636 (Fla. 4th DCA 1976), recognized the trend of allowing recovery of prenatal injuries to viable children and concluded that a viable unborn child is a "person" within the meaning of Section 768.19.
This court has also recognized that trend of allowing recovery for prenatal injuries. In Day v. Nationwide Mutual Ins. Co., 328 So.2d 560 (Fla.2d DCA 1976), we held that once a child is born alive, there is a relation back to the time of injury in order for that infant person to maintain a cause of action against the tortfeasor. We recognized there that a child injured before birth, once born alive is a "person" under the constitution of the United States and the State of Florida. Each person is entitled to all the constitutional rights, privileges and protections afforded to every other person and once that baby becomes a "person" he should be allowed to recover for the injuries. Besides, we pointed out that the financial needs of such a person should better be borne by the tortfeasor than the tax payers. Parenthetically, in the first paragraph of our opinion in Day, we footnoted the significance of the child being born alive in reference to the Supreme Court's opinion in Stokes.
We perceive the legislative purpose of the wrongful death statute being to provide compensation within the ordinary contemplation of persons who have been born alive. We adhere to the precedent of the Supreme Court in Stokes and the view expressed by our sister court in Davis, and conclude that the Duncan baby was not a person under Florida's old Wrongful Death Act.[2]
Accordingly, the judgment of the trial court is affirmed.
HOBSON, Acting C.J., and GRIMES, J., concur.
NOTES
[1] Plaintiff's third amended complaint was incorrectly brought under Florida's new Wrongful Death Act (effective July 1, 1972), since death occurred on March 20, 1972. The parties now recognize that the former act; i.e., Sections 768.01-.03, Florida Statutes (1971), which apply to all deaths occurring prior to July 1, 1972, to be the applicable statutes.
[2] True, fetal life may exist before birth. The distinction we make in this case is twofold; (1) that such "life" must assume a separate and independent existence, and (2) that to be a "person," that life must evolve into a separate human being.