653 So.2d 499 (1995)
Gwendolyn Golden YOUNG, as Personal Representative of Willisha Golden Young, Deceased, Appellant,
v.
ST. VINCENT'S MEDICAL CENTER, INC., d/b/a St. Vincent's Medical Center and/or d/b/a Family Medical Center, Appellee.
No. 93-2005.
District Court of Appeal of Florida, First District.
April 24, 1995.
James T. Terrell, Annette J. Ritter and Michael S. Sharrit of Brown, Terrell, Hogan, Ellis, McClamma & Yegelwel, P.A., for appellant.
William E. Kuntz and Earl E. Googe, Jr. of Smith Hulsey & Busey, Jacksonville, for appellee.
Richard A. Barnett of Richard A. Barnett, P.A., representing Academy of Florida Trial Lawyers, Hollywood, amicus curiae.
PER CURIAM.
AFFIRMED. Hernandez v. Garwood, 390 So.2d 357 (Fla. 1980); Duncan v. Flynn, 358 So.2d 178 (Fla. 1978); Stern v. Miller, 348 So.2d 303 (Fla. 1977); Henderson v. North, 545 So.2d 486 (Fla. 1st DCA 1989); Abdelaziz v. A.M.I.S.U.B. of Florida, Inc., 515 So.2d 269 (Fla. 3d DCA 1987), review denied, 525 So.2d 876 (Fla. 1988); and Davis v. Simpson, 313 So.2d 796 (Fla. 1st DCA 1975).
While we feel that the question of whether a fetus is a person within the meaning of section 768.19, Florida Statutes (1993), has been extensively addressed in the previously cited cases, in deference to the views expressed by Judge Mickle and his special concurrence, we again certify this question to be one of great public importance.
WOLF, J., concurs.
MICKLE, J., specially concurs with opinion.
WEBSTER, J., concurs in part and dissents in part with opinion.
MICKLE, Judge, concurring specially.
I concur with the majority that an affirmance is mandated by the Florida Supreme Court's decisions in Hernandez v. Garwood, 390 So.2d 357 (Fla. 1980); Duncan v. Flynn, 358 So.2d 178 (Fla. 1978); and Stern v. Miller, 348 So.2d 303 (Fla. 1977). I write, however, to address appellant's invitation to our supreme court to revisit these decisions.
The question at issue in this case is whether there is a right of recovery under the Florida Wrongful Death Act, sections 768.19-768.27, Florida Statutes (1989), on behalf of a stillborn child who died as a result of injuries received while in her mother's womb. The pertinent facts of this case as alleged in the complaint are as follows. In June 1989, Gwendolyn Young (hereinafter Young) discovered she was pregnant with twins. In November 1989, after a thirty-four week gestational period, Young experienced premature labor pains and was admitted to St. Vincent's Medical Center (St. Vincent's). While attempting to draw amniotic fluid to *500 determine the maturity of the babies' lungs, a doctor in training twice punctured some portion of one of the babies, withdrawing blood instead of amniotic fluid. The amniocentesis procedure was then turned over to, and completed by, the attending physician. Gwendolyn was then discharged from the hospital. No test was performed to discover whether either fetus was bleeding. On the following day, Young experienced labor pains again, and returned to St. Vincent's. The child that had been punctured the previous day was hooked up to a malfunctioning fetal monitor. When the physicians realized this, they attached a functioning heart monitor only to discover that the baby had no heart rate. An emergency Caesarean section was then performed. Although one of the twins, Jessica, was born alive, the other, Willisha, who had been punctured during the amniocentesis, was not.[1]
Young sued St. Vincent's on behalf of Willisha, alleging negligent prenatal care and the resulting wrongful death of her unborn daughter.[2] St. Vincent's moved for summary judgment on the basis that the complaint failed to allege that the fetus was born alive. Young filed in the record the affidavit of a physician who attested that Willisha would have survived delivery but for the negligence of St. Vincent's, and that the baby was a person capable of independent survival outside of her mother's womb. The trial court, finding that the record demonstrated Willisha was not born alive, entered summary final judgment as a matter of law in favor of St. Vincent's on the basis that Florida law does not permit a cause of action for wrongful death of an unborn child, citing as authority Stern and Hernandez.
Young impliedly concedes that the instant case is governed by the cases cited by the lower court, but requests that the underlying ratio decidendi of these cases be revisited.

Florida Law
The Florida Supreme Court has consistently refused to allow a cause of action for the wrongful death of unborn children. The court first dealt with this issue in the context of the Wrongful Death of Minors Act,[3] which was later replaced by the current Wrongful Death Act. In Stokes v. Liberty Mutual Insurance Co., 213 So.2d 695 (Fla. 1968), Mrs. Stokes was in her seventh month of pregnancy when she was involved in an automobile accident, followed several days later by the stillbirth of her child. Alleging that the child's wrongful death resulted from the negligent actions of the other motorist, the Stokeses proceeded under the Wrongful Death of Minors Act, asserting that the stillborn infant was included within the statutory term "minor child." Affirming the trial court's dismissal of the wrongful death action, the Florida Supreme Court held that a stillborn infant is not a "minor child" within the statutory language of the Wrongful Death of Minors Act. Declaring that the right of action for wrongful death could arise only after the live birth and subsequent death of the child, the court emphasized that it was not called upon to determine whether the stillborn child was a "person" under the *501 general Wrongful Death Statute. Stressing the unique language of the Wrongful Death of Minors Act, the court declined even to consider the cases cited by the parents allowing recovery for the death of a "person" in utero. Arguably, the court intended to leave unanswered the question of whether an unborn fetus is a "person" under the general wrongful death statute and merely required a live birth for a claim under the special Wrongful Death of a Minor provisions.
On July 1, 1972, the new consolidated Florida Wrongful Death Act superseded the Wrongful Death of Minors Act,[4] the old Wrongful Death Act,[5] and the Survival Act[6] and created one general action for the wrongful death of any "person." The new Act provides as follows:
When the death of a person is caused by the wrongful act, negligence, default, or breach of contract or warranty of any person, including those occurring on navigable waters, and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued, the person or watercraft that would have been liable in damages if death had not ensued shall be liable for damages as specified in this act notwithstanding the death of the person injured, although death was caused under circumstances constituting a felony.
Section 768.19, Florida Statutes (1989). (Emphasis supplied.)
The first court called upon to interpret the new Act was this court in the case of Davis v. Simpson, 313 So.2d 796 (Fla. 1st DCA 1975). In answering the circuit court's certified question "[is] a full term, viable, but stillborn fetus a `person' within the meaning of § 768.19, Florida Statutes, 1973," in the negative, this court opined that the determinative issue was whether or not it was the intent of the Legislature in its enactment of the new Wrongful Death Act to include within the meaning of the term "person" an unborn fetus. After discussing the history of Florida's prior death statutes, the Florida Supreme Court's analysis of those statutes in Stokes, and the minimal differences between the former statutes and the new Act, this court held:
We must assume that the legislature knew the construction that had been placed upon the previous death by wrongful act statute by the Supreme Court in Stokes when it enacted the new statute. There is no departure in the wording of the new statute from that of the old with relation to "persons" and "minor children" which would indicate an intent to create a new right of action on behalf of an unborn fetus. Had the legislature intended to make such a radical change in the law, there is every reason to believe that it would have done so in clear language. This is a matter for legislative action and not for judicial legislation.
Id. at 798.
In 1977, the Florida Supreme Court was asked again to address the issue. In Stern v. Miller, 348 So.2d 303 (Fla. 1977), decided under the current Wrongful Death Act, a husband and wife brought suit for the wrongful death of their unborn child. It was alleged that defendant's negligence caused an automobile accident when Mrs. Miller was seven months pregnant, resulting in the stillbirth of the child. The trial court dismissed the complaint for failure to state a cause of action. The Fourth District Court of Appeal reversed, holding that a viable, unborn child is a "person" under the Florida Wrongful Death Act. Opining that the Florida Supreme Court had not yet ruled on this point in the context of the new Wrongful Death Statute, and finding that the Legislature had expressly provided that the Wrongful Death Act was to be liberally construed, the Fourth District took the view that the Legislature would have expressly excluded, rather than expressly included, unborn children if that were its intent. Miller v. Highlands Insurance Co., 336 So.2d 636 (Fla. 4th DCA 1976). The court noted conflict with this court's *502 decision in Davis and certified the following question to the Florida Supreme Court as a matter of great public interest:
Whether an unborn, viable child killed as a direct and proximate result of another's negligence, is a "person" within the meaning of the Wrongful Death Act?"
The Supreme Court, in Stern, answered this certified question in the negative, quashed the opinion of the district court and remanded the action, holding that a viable fetus killed as a direct and proximate result of another's negligence is not a "person" within the meaning of the Wrongful Death Act. The court began its discussion by stating that an action for wrongful death is a creature of statute, unknown to common law. Reasoning that the Legislature was aware of the Stokes decision when it enacted the Wrongful Death Act in 1972 without materially changing the language of the prior statute, the court stated, "it must be presumed that the legislature intended to carry forward into the new section the terms `person' and `minor child' as previously construed." Id. at 307. The court reasoned that, because Stokes was decided before the new wrongful death statute was enacted, the Legislature is deemed to have implicitly accepted the judicial construction of the word "person" contained therein by failing to further define it when the opportunity arose. Finally, the court opined that the reading of the damages section of the Act clearly reflected that the Legislature did not intend to create a cause of action for a stillborn child. The court declined to construe the provisions of the Act so liberally as to reach a result contrary to the clear intent of the legislature. In reaching its decision in Stern, the justices noted that the weight of authority was contra, and conceded that the policy arguments in favor of recovery are compelling. Nonetheless, the Stern court, with apparent reluctance,[7] quashed the Fourth District Court's conclusion that the better view is that which allows a cause of action for the wrongful death of a viable, unborn child  a "person" within the meaning of the Act. Id. at 306-308.
Before the supreme court decided Stern, the Second District Court considered perhaps the most horrifying of all cases involving the death of an unborn child. In Duncan v. Flynn, 342 So.2d 123 (Fla. 2d DCA 1977), Mrs. Duncan was admitted into the hospital for the delivery of her fourth child. Labor was induced and, shortly after Mrs. Duncan was taken into the delivery room, the baby's head emerged. The physician attempted to deliver the nearly fifteen-pound child vaginally but the baby's shoulders were too wide to allow further passage and the baby remained lodged in the birth canal. After twenty unsuccessful minutes of attempts at delivery, the attending physicians discovered that the fetal heartbeat tones had disappeared. Concluding that the baby could not be born alive, the physicians directed their efforts toward protecting the mother's condition. After receiving the husband's permission, they removed the baby's head and extracted the remainder of the baby's body by Caesarean section. The death certificate cited as the cause of death, "cardiovascular failure due to or as a consequence of strangulation." Id. at 124.
The father, as administrator of the estate of the deceased child, brought a wrongful death action alleging that the negligent failure of the physician and hospital to recognize in advance that a Caesarean section would be required caused the death of the baby during the course of childbirth. The complaint was summarily dismissed by the trial court on the basis that there could be no claim for the wrongful death of the unborn fetus. The Second District Court affirmed the lower court's decision, holding that, as a matter of law, the decedent was not born alive, and that the "unborn viable fetus" was not a "person" under Florida's former wrongful death statute.[8] On the issue of whether the *503 child was born alive, the court went so far as to state that to constitute live birth so as to give rise to an action for wrongful death, a child must acquire a separate and independent existence from the mother. The test of whether existence is separate and independent, opined the court, would be met by a showing of expulsion (or in a Caesarean section by complete removal) of the child's body from its mother with evidence that the umbilical cord has been cut and the infant has an independent circulation of blood. Id. at 126. Applying this test to the facts, the court ruled that even if the Duncan baby had taken a breath, since it was "unthinkable to conclude the baby had the required separate and independent existence considering the necessity for the physicians to remove the baby's head before they could even remove its torso from Mrs. Duncan," the lower court was correct in entering summary judgment in favor of the doctor and hospital. Id. at 126.
By the time the Second District Court's decision reached the supreme court, Stern had been decided. Adhering to its holding in Stern, the supreme court upheld the Second District Court's ruling in a 4-3 decision, with a dissent filed by Justice Karl.[9]Duncan v. Flynn, 358 So.2d 178 (Fla. 1978).
Finally, in 1980, in Hernandez v. Garwood, 390 So.2d 357 (Fla. 1980), the supreme court issued its latest affirmation of its previous holdings, citing Duncan and Stern. Since 1980, the holding that an unborn child is not a person within the meaning of the Wrongful Death Act has not been explicitly addressed by the supreme court. Clinging to the notion that the common law allowed no cause of action for the wrongful death of a fetus, and discerning no legislative intent to include an unborn child within the definition of "person," our supreme court continues to wait for legislative action on this subject. To this date, legislative action has not been forthcoming.[10]

Foreign Law
The subject has now been extensively litigated in other states. The definite trend, and the overwhelming weight of authority[11], recognizes the right of recovery for the wrongful death of an unborn child resulting from injuries sustained while in its mother's womb. While three states have done so statutorily,[12] most of the state courts included in the majority view have considered the question as appropriately invoking the exercise of the judicial power of statutory construction. Recognizing that actions are almost universally allowed for prenatal injuries, foreign courts have concluded that it would be irrational to prohibit recovery for a more severe injury causing the death of a fetus. Developing in these foreign jurisdictions is the notion that the recognition of a fetus as a person is most consistent with current human experience and knowledge concerning fetal development and the ability of the fetus to survive independently of the mother. In short, numerous foreign courts have dispelled the notions *504 upon which our supreme court based its holdings in Stern, Duncan and Hernandez.
In Mone v. Greyhound Lines, Inc., 368 Mass. 354, 331 N.E.2d 916 (Mass. 1975), the Massachusetts Supreme Court held that an eight and one-half month old unborn, viable fetus was a "person" for the purposes of the state's wrongful death statute. The court noted that a clear majority of jurisdictions having considered the question had chosen viability over live birth as the determinative factor for deciding whether a right of action for wrongful death would be allowed; that judicial action altering the interpretation of statutory language, in an area previously considered a part of the common law, was appropriate; that it was unnecessary for the court to wait for the legislature to change the rule denying a right of action for the death of a viable fetus; and that neither the danger that the damages recoverable would be speculative nor the danger of double recovery could justify the denial of a right of action in the present case. Recognizing that the rule fixing survival as the determinant had the appeal of simplicity, the court held that such a rule "`might aid the judiciary but hardly justice.'" Id. (quoting Todd v. Sandidge Constr. Co., 341 F.2d 75, 77 (4th Cir.1964).
The Supreme Court of Arizona, in Summerfield v. Superior Court, 144 Ariz. 467, 698 P.2d 712 (Ariz. 1985), challenged the initial premise relied on in Stern, to wit, that no right of action for wrongful death existed at common law. After analyzing the evolution of the common law rule with respect to the right of a survivor to maintain an action for the death of the victim, the court declared it was uncertain whether common law precluded recovery for wrongful death. Although the court in Summerfield did not definitively conclude that a wrongful death action is recognized at common law, or that such action should be allowed irrespective of legislative intention or pronouncement, it did go so far as to state that statute and precedent have combined to produce a cause of action with common law attributes. Id. at 473, 698 P.2d at 718, citing Mone v. Greyhound Lines, Inc. After speaking to this topic, court opined that even if the Arizona legislature believed it was creating a new statutory right of action, there was no evidence to suggest it intended to occupy the field, leaving no room for judicial intervention. Quite to the contrary, the court found that certain phrases within the statutory grant of damages in fact invited the judiciary to participate in construing the statute and setting the parameters of the action. The court pointed out examples of previous judicial pronouncements clarifying the statute. Applying principles of statutory construction, and discerning a legislative goal of protecting a fetus in other areas of the law (manslaughter, abortion and property law), the court concluded that the word "person" encompassed a stillborn, viable fetus. Id. at 479, 698 P.2d at 724.
Many of the courts that now allow a cause of action draw logical support for their conclusion from the fact that a fetus born alive may sue for prenatal injuries. As stated by the Court of Appeals for the Fourth Circuit in interpreting South Carolina's wrongful death statute:
To balance the right of action upon whether a child, fatally injured by the negligence of another, is born dead or alive seems not only an artificial demarcation but unjust as well. To illustrate, if the trauma is severe enough to kill the child, then there could be no recovery; but if less serious, allowing the child to survive, there might be recovery. Again, if the fatality was immediate, the suit could not prevail, but if the death was protracted by a few hours, even minutes, beyond birth, the claim would succeed. Practically, it would mean that the graver the harm the better the chance of immunity. Moreover, it allows the act of the tortfeasor to foreclose his own liability  the life of the action would be in his hands.
Todd v. Sandidge Constr. Co., 341 F.2d at 76-77.
Numerous other courts have employed similar reasoning in allowing suits for the wrongful death of a viable fetus. See Eich v. Town of Gulf Shores, 293 Ala. 95, 300 So.2d 354 (Ala. 1974) (denying cause of action would only serve the tortfeasor by rewarding him for his severity in injuring the fetus and would immunize the greater harm); Chrisafogeorgis v. Brandenberg, 55 Ill.2d 368, 304 N.E.2d 88 *505 (Ill. 1973) (illogical to deny cause of action in light of the fact that a child born alive may sue for prenatal injuries because liability would attach upon injuring fetus but not killing it); State, Use of Odham v. Sherman, 234 Md. 179, 198 A.2d 71 (Md. 1964) (no reason to cut off cause of action because child born dead, while allowing cause of action if child born alive); Stidam v. Ashmore, 109 Ohio App. 431, 167 N.E.2d 106 (Oh.App. 1959) (if viable twin fetuses suffered same simultaneous prenatal injury but only one was born alive, it would be illogical to allow one to recover and not the other); Amadio v. Levin, 509 Pa. 199, 501 A.2d 1085 (Pa. 1985) (difficulties in proving damages in an action for wrongful death of a fetus cannot be greater or different in character from the difficulties in determining damages for the wrongful death of a child which survived delivery for a few minutes).
A minority of states continue to refuse a cause of action for the wrongful death of a fetus. Courts holding the minority view have generally declined to permit a cause of action on the theory that to do so would infringe upon the exclusive prerogative of the legislature to create rights and interests. Thus, the issue is framed as a matter of determining the proper bounds of the judicial function rather than a strict question of statutory interpretation. In short, these states generally adhere to the proposition that a fetus is not a "person" based either on the grounds that wrongful death recovery is purely statutory with little room for judicial intervention, that the respective legislatures did not intend for a "person" or "individual" to include a fetus, and/or that damages and proof of causation are too speculative.
Early courts refusing to recognize a cause of action often pointed to the problems of proof associated with such a claim and determined that these problems suggested that no such claim should be allowed to lie. Modern courts have eroded this line of reasoning on the basis that advances in medical science have provided a better understanding of the viability of fetuses, of the means of their termination, and of the proper measure of damages to be awarded. See Chrisafogeorgis. In addition, problems of proving certain injuries should not impact heavily upon the central issue of whether a cause of action lies in the first place. Wade v. U.S., 745 F. Supp. 1573 (D.Hawaii 1990) (citing Mitchell v. Couch, 285 S.W.2d 901 (Ky. 1955); Amadio.

Legislative Intent
As was the case in Summerfield, there is no clear evidence to suggest that the Florida Legislature intended to govern exclusively the cause at issue. It appears more likely that the Legislature merely intended to provide a wrongful death action, leaving its administration and construction to the courts. Since the statute's enactment, the Florida Legislature has made minimal modifications thereto. In large part, these revisions have concentrated on identifying beneficiaries of the action.[13] The only other significant change concerned minor additions to the damages section of the Act.[14] It seems, then, that aside from these revisions, the Legislature has not occupied the field so fully as to preclude judicial development. Indeed, Florida courts have entered the field in a variety of ways. For example, the courts have defined the recovery rights of illegitimate children,[15] adopted children,[16] and remarried spouses.[17] These judicial determinations would have been totally inappropriate if the Legislature had intended to foreclose judicial initiative in this area. As opined in Summerfield, these and further judicial clarifications and divinations of legislative intent make it clear that the judiciary has not contented itself with passive application of the exact wording of the wrongful death statute. Id. at 473, 698 P.2d at 718.
Our supreme court divines meaning from legislative silence in the face of judicial opinions. I, like several of the foreign majority *506 courts cited, am unable to ascribe any discernible meaning to legislative silence. The North Carolina Supreme Court, in DiDonato v. Wortman, 320 N.C. 423, 358 S.E.2d 489 (N.C. 1987), declared that North Carolina's Wrongful Death Act allows for recovery of death of a viable unborn child. As in Florida, the North Carolina Legislature had not disturbed previous lower appellate court decisions denying a right of recovery. The North Carolina Supreme Court declined to consider this legislative silence dispositive, stating:
We must be leery ... of inferring legislative approval of appellate court decisions from what is really legislative silence. "Legislative inaction has been called a `weak reed upon which to lean' and a `poor beacon to follow' in construing a statute." (Citation omitted.) "[It is] impossible to assert with any degree of assurance that [legislative inaction] represents (1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of the status quo, (4) indifference to the status quo, or even (5) political cowardice." (Citation omitted.) We cannot assume that our legislators spend their time poring over appellate decisions so as not to miss one they might wish to correct.
Id. at 490.
In the absence of explicit legislative direction that would foreclose judicial consideration of the meaning of "person," it would appear that the process of defining the term remains a proper judicial function. It is left up to the courts to interpret the Act in a manner to prevent inequity. The stated legislative purpose of the Act is to shift the losses resulting from the wrongful death from the survivors of the decedent to the wrongdoer. Florida's Wrongful Death Statute specifically states that its provisions are to be broadly construed. To me, this implies that rather than intending to fully occupy the field, the Legislature intended the courts to have some part in clarifying the cause of action consistent with the express purpose of the Act.
This brings me, then, to the main issue presented: the correct interpretation of the word "person." The Act by its terms does no more than create a cause of action generally and designates the beneficiaries of such an action. Whether a fetus was or can be considered a "person" whose death could give rise to such action is nowhere reflected in the language of the Act. In making the determination whether an unborn fetus is a person under the Wrongful Death Act, courts must approach the issue with a view to promoting the object of the legislative enactment. Section 768.17, Florida Statutes, entitled "[l]egislative intent," specifically provides:
It is the public policy of this state to shift the losses resulting when wrongful death occurs from the survivors of the decedent to the wrongdoer. Sections 768.16-.27 are remedial and shall be liberally construed.
In determining the intent of the Legislature, the courts must construe a statute in light of the purposes for which it was enacted and the evils it was intended to cure. That the Florida Legislature has sought to protect unborn children is illustrated by other statutes. For example, section 782.09 provides that the "willful killing of an unborn, quick child ... shall be deemed manslaughter." Other examples of legislative intent to protect unborn children can be found in section 797.03(3), proscribing any person from performing or assisting in the performance of an abortion in the third trimester of pregnancy other than in a hospital, and in section 731.303(2)(c), the Probate Code, referring to an unborn or unascertained "person" with regard to property rights. The legislative goal of protecting unborn children, as evidenced in Florida's homicide, abortion, and probate statutes, strongly supports the recognition of a civil wrongful death action where a viable, but not yet born, child dies as a result of negligence.
The Stern court adopts a reading of the statute which makes it economically preferable for a tort-feasor to kill a fetus rather than merely injure it. That is precisely the injustice that the wrongful death statute was designed to remedy. The weight of authority concludes it is unreasonable and indefensible to condition recovery upon live birth. I must concur with the weight of authority, and with Ms. Young, that it is both illogical and unreasonable *507 to distinguish between injuries wrongfully inflicted upon a viable fetus that result in death just prior to the infant's separation from the mother, and those which cause either permanent injuries or death itself, but at some short interval after birth has occurred. In Duncan, the death of the child relieved the defendants from any liability. Had the child been expelled completely from its mother and then died instantaneously, the action would have gone forward. Since, however, the child died in the midst of delivery, the doctor and hospital were immune from suit under the Wrongful Death Act. This result contradicts the public policy of this state, declared in section 768.17, Florida Statutes, to wit, to shift losses from the survivors to wrongdoers. Under the present state of the law, a physician, facing liability for injuring a child before or during birth, would fare better legally by permitting the child to die before it has been expelled rather than by attempting to save it.

Conclusion
Ms. Young urges the Florida Supreme Court to reconsider the principles espoused in Stern, Duncan and Hernandez, and to adopt the weight of modern authority that requires only that the death dealing injuries occur when the child is viable en ventre sa mere (in the womb of the mother). The cause of action in these types of cases arises at the time of injury and should not thereafter be cut off because of the child's death before birth. The logical alternative to drawing an arbitrary line at the moment of live birth is to recognize a cause of action for the unborn, yet viable, child, while placing the burden of proving viability, injury and damages on the claimant. The record in this case contains a physician's sworn statement that Willisha was capable of independent survival outside of her mother's womb, and that she would have survived delivery but for the negligence of St. Vincent's. Ms. Young requests very simply that she be granted the opportunity to prove up her claim that her daughter would be alive today were it not for negligent acts alleged in the complaint. Reflecting upon a change in the attitude of our sister states permitting these actions, and in light of the fact that the reasons formerly relied on to deny maintenance of such actions no longer are persuasive, I agree that the time has come for our supreme court to reconsider joining our sister states in recognizing that wrongful death actions lie by the estates of stillborn children for fatal injuries they received while viable children en ventre sa mere.
WEBSTER, Judge, concurring in part, and dissenting in part.
I concur in affirmance of the summary final judgment appealed. However, I dissent from the decision to certify a question to the supreme court. While much may have changed since our supreme court decided Hernandez v. Garwood, 390 So.2d 357 (Fla. 1980), I am of the opinion that one thing clearly has not  whether to permit recovery under Florida's Wrongful Death Act on facts such as those presented by this appeal is a question for legislative, rather than for judicial, resolution. As Judge Mickle points out, repeated efforts in recent years to amend the Act to permit recovery on facts such as those presented by this appeal have met with no success. It seems to me that, in light of the legislature's refusal to act, the action requested by appellant would constitute an impermissible incursion by the judicial branch into the powers of government vested by our constitution in the legislature. Therefore, while the question may be one "of great public importance," by certification, the wrong branch of government is being asked to provide an answer.
NOTES
[1] Jessica, who weighed five pounds, eight ounces at birth, is now a healthy 5-year-old.
[2] The following negligent acts were alleged: (1) failure to properly perform the amniocentesis; (2) performance of the amniocentesis in such a manner so as to cause internal bleeding; (3) failure to timely and/or appropriately perform tests following the amniocentesis to determine whether internal bleeding had occurred; (4) failure to appropriately and/or adequately supervise a resident who was performing the amniocentesis; (5) allowing a resident with inadequate training and/or experience to perform the amniocentesis; (6) failure to keep the mother in the hospital on a fetal monitor after the amniocentesis was completed up until the birth of the twins; (7) failure to recognize and/or properly respond to decelerations on the fetal monitor following amniocentesis; (8) failure to initiate labor or perform a Caesarean section when the amniocentesis showed lung maturity; (9) failure to place the unborn twins on adequately and properly functioning fetal monitors during the labor process; (10) placing the unborn twins on a malfunctioning fetal monitor; (11) failure to adequately monitor the twins during labor; (12) failure to timely and/or appropriately recognize fetal monitor changes consistent with fetal distress of Willisha; (13) failure to timely and/or appropriately treat Willisha; (14) failure to appropriately and/or adequately supervise the personnel treating the mother and her babies during a high-risk delivery.
[3] F.S. 768.03 (1965).
[4] F.S. 768.03 (1971), superseded by F.S. 768.16.27 (1973).
[5] F.S. 768.01 (1971), superseded by F.S. 768.16.27 (1973).
[6] F.S. 45.11 (1965), as amended, F.S. 46.021 (1971), superseded by F.S. 768.16-.27 (1973).
[7] The court noted, "... it is absurd to allow recovery for prenatal injuries unless they are so severe as to cause death." Id. at 306.
[8] Duncan was decided under the former Wrongful Death Act (F.S. 768.01-.03 (1971), superseded by F.S. 768.16-.27 (1973)) because the death occurred three and one-half months prior to the effective date of the current Wrongful Death Act. It is likely that the outcome would have been similar if decided under the current Wrongful Death Act, as each provides a cause of action for the wrongful death of any "person."
[9] Although Justice Karl concurred with the determination that an unborn, viable fetus is not a "person," under the Act, he opined that no rule of law should be adopted which fixes the occurrence of live birth upon severance of the umbilical cord. Duncan, 358 So.2d at 180.
[10] Recent efforts to amend the Wrongful Death Act have been defeated. In 1988, identical bills were filed in both the House and Senate that would have added the term "unborn children" to the definitions of "person" and "minor children" in § 768.19. Neither was adopted. The House Bill was defeated in the judiciary committee; the Senate Bill did not have enough support to reach a floor vote. See, T.A. Borowski, Jr., Comment, No Liability for the Wrongful Death of Unborn Children  The Florida Legislature Refuses to Protect the Unborn, 16 Fla.St.U.L.Rev. 835, 839 (1988). An identical bill was unsuccessfully introduced in the House in 1989. Id. at 861.
[11] At last count, thirty-four state courts have judicially created a cause of action permitting recovery for the death of a stillborn child, at least where the fetus was viable, either in cases of first impression or in decisions revising prior law. In three more states, the state legislatures have created a statutory cause of action. Five states have not passed on the matter. Seven states, of which Florida is one, remain in the minority, adhering to the rule denying recovery. See generally T.A. Borowski, Jr., supra, at 846; Annotation, Right to Maintain Action or to Recover Damages for Death of Unborn Children, 84 A.L.R.3d 411, 422-425 §§ 3[a]-3[b] (1978 & Supp. 1994).
[12] Illinois, South Dakota, and Tennessee have enacted statutes which allow a cause of action for wrongful death of a fetus, a viable fetus, and an unborn child, respectively.
[13] F.S. 768.18.
[14] F.S. 768.21.
[15] Whitefield v. Kainer, 369 So.2d 684 (Fla. 4th DCA 1979).
[16] Grant v. Sedco Corp., 364 So.2d 774 (Fla. 2d DCA 1978).
[17] Smyer v. Gaines, 332 So.2d 655 (Fla. 1st DCA 1976).